**EXHIBIT "F"**

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA
GENERAL JURISDICTION DIVISION

CITIBANK, N.A., a national banking
association,

        Plaintiff,

      v.                           Case No.:  CACE 10023623 (12)

ANTICO STONE, LLC, a Florida limited
liability company; CIOTTOLO L.L.C.,
a Florida limited liability company,
et al.,

        Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**DEPOSITION OF**

**AVI YAHAV**

July 23, 2010
8:56 a.m.

10001 Northwest 50th Street
Suite 204
Fort Lauderdale, Florida

Reported By:
Tamra K. Piderit, FPR, RPR, CRR, CLR

1

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA
GENERAL JURISDICTION DIVISION
Case No.:  CACE 10023623 (12)


CITIBANK, N.A., a national banking
association,

               Plaintiff,          ORIGINAL

   v.

ANTICO STONE, LLC, a Florida limited
liability company; CIOTTOLO L.L.C.,
a Florida limited liability company,
et al.,


               Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


DEPOSITION OF

AVI YAHAV

TAKEN ON BEHALF OF THE PLAINTIFF


Friday, July 23, 2010
8:56 a.m. - 10:04 a.m.



Held at:

Law Offices of Daniel G. Gass
10001 Northwest 50th Street
Suite 204
Fort Lauderdale, Florida



Reported By:
Tamra K. Piderit, FPR, RPR, CRR, CLR



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                                July 23, 2010

2

1       APPEARANCES OF COUNSEL

2

        ON BEHALF OF THE PLAINTIFF:

3

                CARLTON FIELDS
4               BY:  Alan Rosenthal, Esquire
                     Michael E. Strauch, Esquire
5               4000 International Place
                100 Southeast Second Street
6               Miami, Florida 33131-2114
                305.530.0050
7               305.530.0055 Fax
                arosenthal@carltonfields.com
8               mstrauch@carltonfields.com

9

10

        ON BEHALF OF THE DEFENDANT:

11

                LAW OFFICE OF DANIEL G. GASS
12              BY:  Daniel G. Gass, Esquire
                10001 Northwest 50th Street
13              Suite 204
                Fort Lauderdale, Florida 33351
14              954.741.8228

15

16

17

18

19

20

21

22

23

24

25



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                            July 23, 2010

3

1                          INDEX OF EXAMINATION

2          WITNESS:                                    PAGE

3          AVI YAHAV

4          DIRECT EXAMINATION

           By Mr. Rosenthal                              5

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                          July 23, 2010

4

1                        INDEX TO EXHIBITS
2
        Plaintiff's Exhibits
3
        No.                Description                Page
4
        1       Defendants, Antico Stone, LLC,         13
5               Yahav Properties, LLC, and Avi
                Yahav's Response to Plaintiff's
6               Motion for Order to Show Cause Why
                Prejudgment Writ of Replevin Should
7               Not Be Issued
8       2       Affidavit of Avi Yahav                 13
9       3       Commercial Security Agreement          28
                with Antico Stone, LLC as Grantor
10
        4       Commercial Security Agreement          28
11              with Ciottolo, LLC as Grantor
12      5       Florida Department of State            33
                Division of Corporations Officer/
13              Registered Agent Name List
14      6       Florida Department of State            34
                Division of Corporations Detail
15              by Entity Name
16      7       Printout from Antico Stone Web         35
                site
17
18
19
20
21
22      *Original exhibits retained by the court reporter
            and attached to the original transcript.*
23
24
25


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

5

```
 1                    P R O C E E D I N G S
 2               DEPOSITION OF AVI YAHAV
 3                     July 23, 2010
 4
 5           Deposition taken before Tamra K. Piderit,
 6     Florida Professional Reporter, Registered
 7     Professional Reporter, Certified Realtime Reporter,
 8     Certified LiveNote Reporter, and Notary Public in
 9     and for the State of Florida at Large, in the above
10     cause.
11           THE COURT REPORTER:  Do you solemnly swear
12       that the testimony you are about to give in the
13       matter before you will be the truth, the whole
14       truth, and nothing but the truth?
15           THE WITNESS:  Yes, I do.
16                     AVI YAHAV,
17     having been duly sworn, was examined and testified
18     as follows:
19                 DIRECT EXAMINATION
20     BY MR. ROSENTHAL:
21       Q.  Please state your name and address.
22       A.  Avi Yahav.  I live at 19499 Black Olive
23     Lane, Boca Raton, Florida 33498.
24       Q.  Mr. Yahav, is that your legal name?
25       A.  Avi Yahav, yes.
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                          July 23, 2010

6

1          Q.   Were you formerly known by another name?

2          A.   I changed my family name from Yaacobovich to

3     Yahav.  Like Y-a-a-c-o-b-o-v-i-c-h.

4          Q.   And what is your business address, sir?

5          A.   2001 N.W. 44th Street, Pompano Beach,

6     Florida 33064.

7          Q.   And by whom are you employed?

8          A.   Today I'm employed by M Zed AY.

9          Q.   MZAY?

10         A.   M Zed.

11         Q.   MZAY of Florida Incorporated?

12         A.   I think that's the name, yes.

13         Q.   You are not sure?

14         A.   Yes, that's the legal name, yes.

15         Q.   Is that who issues your paychecks?

16         A.   Um-hm.

17         Q.   You have to say "yes" or "no," sir.

18         A.   Yes.

19         Q.   Now, MZAY of Florida, Inc, the AY stands for

20    Avi Yahav, correct?

21         A.   That's correct.

22         Q.   And the MZ stands for Moshe Zuk?

23         A.   That's correct.

24         Q.   Am I saying that correct?

25         A.   Moshe Zuk.  He shortened his name from



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                                    July 23, 2010

7

1          Zukerberg to Zuk, but, yes, that's correct.
2               Q.  When you say Zukerberg, that's
3          Z-u-k-e-r-b-e-r-g?
4               A.  I don't know how to spell it.
5               Q.  And you have worked with Mr. Zuk for many
6          years, right?
7               A.  I worked with Moshe Zuk for a few years,
8          yes.
9               Q.  At least 10 years, correct?
10              A.  Yeah.  I have a relationship with him for
11         10 years, yes.
12              Q.  And you have worked with him in the granite,
13         marble, and tile business for many years, correct?
14              A.  In the distribution, yes.
15              Q.  Of granite, marble, and tile?
16              A.  Marble and tile installing, not granite.
17              Q.  Mr. Zuk has worked at that address, 2001
18         N.W. 44th Street, with you for many years, correct?
19              A.  No, he is a foreigner.  He don't live here.
20         He lives in Israel.
21              Q.  I didn't ask you where he lived.  I said he
22         works with you at that address?
23              A.  He was not physically with me almost at all.
24              Q.  But he uses that address regularly for the
25         conduct of his business in the marble, tile, and



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                                    July 23, 2010

8

1       stone business, correct?

2           A.   If that's how you want to describe it, so,

3       yes.

4           Q.   You are familiar with a company called

5       Antico Stone, LLC, correct?

6           A.   Yes.

7           Q.   That's your company?

8           A.   Yes.

9           Q.   And Mr. Zuk has an interest in that company

10      also, right?

11          A.   Not at this time.

12          Q.   He used to have an interest in that company,

13      correct?

14          A.   That's correct.

15          Q.   Up until when?

16          A.   I think 5 years ago, something like that.

17      Four or 5 years ago more or less.

18          Q.   How about a company called Antico Stone &

19      Tile, are you familiar with that company?

20          A.   Yes.

21          Q.   And that's a company that you and Mr. Zuk

22      own, correct?

23          A.   Yeah, but this company don't have any

24      activity.  We tried to open this company, but we

25      closed it.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

9

1    Q.   Antico Stone & Tile Incorporated is closed?

2    A.   Yes.  It was never an active company.

3    Q.   You understand, sir, that when you raised

4    your right hand and took an oath --

5    A.   I do.

6    Q.   -- that you understood --

7    MR. GASS:  I'm going to object to that being

8    argumentative.

9    MR. ROSENTHAL:  Can I finish the question,

10   please?

11   MR. GASS:  Sure.  You make him sound like he

12   was a liar in the process of your question,

13   please.

14   MR. ROSENTHAL:  I believe, Mr. Gass, that

15   your objections are limited to only form, and I

16   would ask you to not make speaking objections.

17   MR. GASS:  I appreciate that, but I'm

18   allowed to speak.

19   Q.   You understand that by taking that oath, the

20   testimony you give here today is under penalty of

21   perjury, correct?

22   A.   What does perjury mean?

23   Q.   It means it's a crime to not tell the truth.

24   A.   Yes.

25   Q.   You understand that?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                          July 23, 2010

                                                              10

1          A.  Yes.  Again, I want to repeat, MZ -- okay.

2          Q.  Are you familiar with a company called

3     Antico Stone & Tile Collection Incorporated?

4          A.  Yes.  This is the company that I told you

5     that has never been active.  Maybe it was active but

6     nothing happened over there.

7          Q.  Which is it, sir, maybe it's active?  It is

8     active?  It's not active?  Which one?

9               MR. GASS:  I'm going to object as

10          argumentative.

11         A.  There isn't any business transaction in this

12    company.

13         Q.  Isn't it true, sir, that the Web site for

14    your marble, tile, and stone business is called

15    Antico Stone & Tile?

16         A.  That's correct.

17         Q.  And the company --

18         A.  And Antico Stone & Tile it's a d/b/a of M

19    Zed of Florida.

20         Q.  When you say zed, you mean Z?

21         A.  Z, yes.

22         Q.  Antico Stone & Tile Collection

23    Incorporated --

24         A.  Yes.

25         Q.  -- has an address of 2001 N.W. 44th Street,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

11

1       correct?

2            A.  Yes.

3            Q.  It was filed as a corporation in May 2009,

4       correct?

5            A.  Yes.

6            Q.  And the officers and directors of that

7       company as of May 2009 were Moshe Zuk and Avi Yahav,

8       correct?

9            A.  Yes.

10           *Q.  Those are the same officers and directors of

11      MZAY of Florida, Inc., correct?

12           A.  MZ.

13                MR. GASS:  Only if you know.  Do you know?

14                MR. ROSENTHAL:  Counsel, I'm going to ask

15           you again, please, sir, don't say "if you know."

16           You can't make speaking objections.

17                MR. GASS:  I appreciate that.

18                MR. ROSENTHAL:  Thank you.  Stop it, please.

19                MR. GASS:  I object to the form of the

20           question as misleading.

21                MR. ROSENTHAL:  Objection to form is what

22           the rules limit your objection to.

23                MR. GASS:  I just said that.

24                MR. ROSENTHAL:  You said "misleading."

25                MR. GASS:  I'm objecting to the form of the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                           July 23, 2010

12

1         question because it's misleading.

2              MR. ROSENTHAL:  I didn't ask you the reason.

3         You are prohibited by the rules --

4              MR. GASS:  I'm prohibited from saying that

5         I'm finding the question to be misleading?

6              MR. ROSENTHAL:  Yes, sir.  You are limited

7         to objection as to form.

8              MR. GASS:  I'm not aware of that.

9              MR. ROSENTHAL:  You are not aware of a lot

10        of things, Mr. Gass.

11             MR. GASS:  I appreciate the education that

12        you are going to give me throughout the process.

13             Are we still talking with each other, or are

14        you going to allow me to finish my objection?

15             MR. ROSENTHAL:  I believe you finished it.

16             Read back the question, please.

17             *(Question read).

18        A.   No.  No, because Steve Levy is the president

19        of MZAY of Florida.  I don't remember exactly how we

20        put the, you know, in the sheet that you are

21        looking, but this is.

22        Q.   Who owns the company MZAY Florida, Inc.?

23        Mr. Levy?

24        A.   No.

25        Q.   Who owns it?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

13

1        A.   Moshe Zuk.

2        Q.   How about you?

3        A.   And myself.

4        Q.   Anybody else?

5        A.   No.

6             (Documents marked as Exhibits 1 and 2

7                  for identification)

8        Q.   Mr. Yahav, I show you what's been marked as

9    Plaintiff's Exhibit 1, which is a copy of

10   Defendants, Antico Stone, LLC, Yahav Properties,

11   LLC, and Avi Yahav's response to Plaintiff's Motion

12   for Order to Show Cause Why Prejudgment Writ of

13   Replevin Should Not Be Issued, and attached to it is

14   a Net Asset Purchase Agreement.  Are you familiar

15   with that document?

16       A.   Yes, I am.

17       Q.   And I show you what's been marked as Exhibit

18   2 and ask you if you can confirm that that's your

19   affidavit that Mr. Gass submitted to the Court

20   yesterday in this case?

21       A.   Yes, it is.

22       Q.   And that's your signature at the bottom?

23       A.   Yes, it is.

24       Q.   Notarized by Ms. Polito?

25       A.   Yes, it is.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                                    July 23, 2010

14

1     Q.   The MZAY of Florida Incorporated identified

2     in Exhibit 1, that's the same company you were

3     referring to a moment ago that is owned by you and

4     Mr. Zuk?

5          A.   Can you repeat the name?

6          Q.   MZAY --

7          A.   Yes.

8          Q.   -- of Florida, Inc.?

9          A.   Yes.  Yes.

10         Q.   Antico Stone, LLC, that company was also

11    owned by you and Mr. Zuk, correct?

12              MR. GASS:  Object to the form.  And although

13         I'm not allowed to say it, I think it's

14         misleading.

15         A.   Ten years ago, yes, up to 5 years ago.

16         Q.   In fact, Antico Stone, LLC was started by

17    Mr. Zuk, correct?

18         A.   No, by myself and Mr. Zuk.

19         Q.   Wasn't it originally called Zuk Marble

20    Company?

21         A.   Yes.  We change the name after a couple of

22    months to Antico Stone.

23         Q.   And did you buy Mr. Zuk out of Antico Stone,

24    LLC?

25         A.   When we started the company back in 2000, we



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

15

1   had an agreement that after this amount of time he

2   is going to transfer me over all the shares.  What

3   we did is I earned it doing those 5 years or

4   4 years of working.

5        Q.  Is that agreement in writing anywhere?

6        A.  No.

7        Q.  Is the transfer of membership interest in

8   the limited liability company in writing anywhere?

9        A.  I believe so, yes.

10       Q.  Who has those records?

11       A.  I have to look for them.  I think I should

12  have it, but I need to look for that.  It's very old

13  files.

14       Q.  I see.  And when was the transfer of

15  Mr. Zuk's shares to you in Antico Stone, LLC?

16       A.  I don't recall the date, but 5 years ago,

17  something like that.

18       Q.  But Mr. Zuk remained involved in the

19  business, correct?

20       A.  He was a supplier and he was -- what do you

21  call it -- purchasing agent for my company.

22       Q.  So he worked for Antico Stone, LLC even

23  after he transferred his membership interest to you?

24       A.  As a purchasing -- not he specifically.  He

25  has a company in Israel that's called Zuk Marble,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                              July 23, 2010

16

1    and they was my purchasing agent.

2          Q.   And you are familiar with a company called

3    Zuk Holding, LLC?

4          A.   I believe that this is Moshe Zuk's company.

5    I don't remember too much.

6          Q.   How about Zuk Domestic Holdings

7    Incorporated?

8          A.   I believe it's also a company owned by him.

9          Q.   Zuk Holdings, Inc., you were a manager and

10   member of, were you not, as of September 2007?

11         A.   Okay.  Maybe but I don't remember the exact

12   activity.  I was like a -- how do you call

13   it?  Managing member of like a holding company or

14   what was the other purpose of this.

15         Q.   But you were the manager and member of Zuk

16   Holding, LLC?

17         A.   Yeah, but there is nothing there in this

18   company as far as I remember right.

19         Q.   Is that the way you do business, you keep

20   setting up all these companies that don't do

21   business?

22         A.   No.

23         MR. GASS:  Objection as to the form.  It's

24   argumentative.

25         Q.   Why did you set up Zuk Holding, LLC?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                        July 23, 2010

17

1          A.   I don't remember.

2          Q.   You and Mr. Zuk have continuously been in

3     the business together of marble, tile, and stone in

4     2001 N.W. 44th Street for 10 years, correct?

5          A.   We used to be partners up to like

6     5 years from today, and then I took the ownership

7     like 5 years ago more or less.  And until he said to

8     me recently, then he come and basically took control

9     of MZAY.

10         Q.   But he continued to work with you after 2005

11    when he transferred his ownership interest in Antico

12    Stone, LLC to you?  He continued to work with you as

13    your supplier and your purchasing agent up until the

14    time of the sale to MZAY, correct?

15              MR. GASS:   Objection.  Asked and answered.

16              MR. ROSENTHAL:   Counsel, again, objections

17         as to form are the only permissible objections.

18         A.   Yes, he did.

19         Q.   The Net Asset Purchase Agreement identified

20    as Exhibit 1 between Antico Stone and MZAY of

21    Florida, Inc., you never sent that agreement to

22    Citibank, did you?

23         A.   No.

24         Q.   You never told them about it either, did

25    you?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                                    July 23, 2010

18

1      A.   No.

2      Q.   And you don't know of anybody else that told

3   them about it either, do you?

4      A.   I don't, no.

5      Q.   Now, directing your attention to Exhibit 2,

6   you say in paragraph 7, "Since the inventory was

7   liquidated to pay Antico Stone."  Do you see that?

8      A.   Yes.

9      Q.   Do you see that?

10      A.   Yes.

11      Q.   Can you show me where in the agreement there

12   is any obligation for MZAY of Florida Incorporated

13   to pay Antico Stone anything?  You have it in front

14   of you, right, Exhibit 1?

15      A.   I need to ask my lawyer where is it written,

16   because I don't remember.

17      MR. GASS:  I am not allowed to assist you

18   with your testimony, so please read it over.  If

19   you can't find it, let us know.

20      Q.   Please read it.

21      MR. ROSENTHAL:  Counsel, again, you are

22   telling him how to answer the question.

23      MR. GASS:  He is asking me to assist him.  I

24   told him I can't assist him.

25      MR. ROSENTHAL:  Then you should stop the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                              July 23, 2010

19

1        statement there.  You told him to say he can't

2        find it.

3            MR. GASS:  I told him to look for it, and if

4        he couldn't find it --

5            MR. ROSENTHAL:  Counsel, stop.

6            MR. GASS:  I'm not assisting him in finding

7        it.

8            MR. ROSENTHAL:  You are telling him how to

9        answer.

10           MR. GASS:  You can argue with me or you can

11       go on with your questions.

12           MR. ROSENTHAL:  I'm asking you to stop

13       making your objection.

14           MR. GASS:  I have heard you discipline me

15       throughout the last 15 minutes.  If it continues

16       I might end this deposition.

17       A.   You asked me to?

18       Q.   Show me where in the agreement there is any

19  obligation of MZAY of Florida, Inc. to pay Antico

20  Stone anything.

21       A.   If you are asking me to read it, it will

22  take me hours.

23       Q.   You understand the English language, don't

24  you, sir?

25       A.   Yeah.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                                    July 23, 2010

                                                                      20

1          Q.   That's your signature on the next to last

2     page?

3              MR. GASS:   Objection.   Try not to be

4          insulting to the man.   English is his second

5          language.

6          Q.   Do you speak English fluently, sir?

7          A.   Speak, yes.

8          Q.   How about read?

9          A.   I need time.

10         Q.   Okay.   I direct your attention, sir, to

11    section 2.1, where it says Price.   Could you just

12    read that part, that section, and tell me where

13    there is any obligation for MZAY to pay Antico Stone

14    anything?

15         A.   It doesn't show.

16         Q.   So tell me what you were swearing to 2 days

17    ago when you signed this affidavit marked as

18    Exhibit 2, what you were supposed to be paying --

19    excuse me, what MZAY was supposed to be paying

20    Antico Stone.

21         A.   What MZAY?

22         Q.   You said the inventory was liquidated to pay

23    Antico Stone.   Do you see that?

24         A.   I don't fully understand the question.

25         Q.   Sir, I'm just asking you about the words in



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                                July 23, 2010

21

1     your sworn affidavit that you signed 2 days ago.

2     Did you understand it when you signed it 2 days ago?

3          A.  Maybe, maybe not as somebody will explain to

4     me.

5          Q.  Well, sir, you swore that it was true,

6     didn't you?

7          A.  Yes.

8          Q.  So tell me what payment to Antico Stone you

9     were referring to in paragraph 7 of your affidavit.

10         A.  Okay.  I don't understand what exactly you

11    want from me.  I'm sorry.

12         Q.  Do you see the words "Since the inventory

13    was liquidated to pay Antico Stone"?  Do you see

14    that?

15         A.  "Since the inventory" -- yeah, I can read

16    it.

17         Q.  What does that mean?  Let's start with the

18    inventory.  You are talking about the inventory of

19    Antico Stone, LLC?

20         A.  Yes.

21         Q.  That's the inventory that was the collateral

22    for the Citibank loan?

23         A.  It was collateral for all.  Yeah, it was

24    collateral maybe for Citibank loan.

25         Q.  Only maybe?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                                    July 23, 2010

22

1          A.   It was collateral for Citibank, I think so.
2     It was collateral to suppliers that trust me and
3     gave me inventory waiting to get paid.
4          Q.   Citibank had a recorded lien on all of your
5     inventory, didn't it?
6          A.   I don't know.
7          Q.   You don't know?
8          A.   I don't know.
9          Q.   But the inventory that you are referring to
10    in this affidavit, Exhibit 2, that was the inventory
11    at Antico Stone, LLC, right?
12         A.   Yes.
13         Q.   At 2001 N.W. 44th Street?
14         A.   Yes.
15         Q.   Now, you said the inventory was liquidated.
16    What do you mean by that?  Your affidavit, sir, that
17    you swore to.
18         A.   I mean by that that the inventory was
19    against -- how do you call it -- payment that I owe
20    to Zuk Marble, to Moshe Zuk.
21         Q.   It says Antico Stone.  It says you had to
22    pay Antico Stone.
23         A.   So I believe it's a typing error.
24         Q.   So that's wrong?
25         A.   I don't know.  I'm a bit confused.  I know



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                              July 23, 2010

23

1      exactly what I pay from the inventory to money that

2      I was owing.

3          Q.   When you signed the Net Asset Purchase

4      Agreement marked as Exhibit 1, you did sign it,

5      right?

6          A.   Yes.

7          Q.   And you understood it when you signed it?

8          A.   I understood the idea about what's

9      happening, yes.

10         Q.   Now, as part of this agreement, you sold the

11     inventory that was at 2001 N.W. 44th Street to MZAY

12     of Florida Incorporated, right?

13         A.   Yes.

14         Q.   Okay.  Now, MZAY of Florida Incorporated did

15     business out of the same address, correct?

16         A.   Yes.

17         Q.   So the inventory that belonged to Antico

18     Stone on June 29, 2009, after it was sold to MZAY of

19     Florida, Inc., it stayed in the same place, right?

20         A.   Yes.

21         Q.   And MZAY of Florida, Inc. continued to do

22     business at the same location with the same

23     inventory, correct?

24         A.   Yes.

25         Q.   Going back to Article II of the agreement,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                                    July 23, 2010

24

1    MZAY of Florida, Inc. did not pay any cash to Antico

2    Stone, LLC, did it, as part of this agreement?

3         A.  Paid with inventory.  They didn't pay cash,

4    no.

5         Q.  And you said MZAY paid with inventory?

6         A.  MZAY -- I think so, yeah.  I cannot recall

7    exactly.  You are a little bit confusing me, but I

8    know exactly what's happened.

9         Q.  I'm directing you to the agreement, sir.

10        A.  Okay.

11        Q.  Do you see the agreement?

12        A.  Yes.

13        Q.  Show me where it says that MZAY paid

14   anything.  Show me.

15        A.  I don't see it.

16        Q.  Do you see where it says in section 2.1

17   "debt forgiven by purchaser"?  Do you see that?

18        A.  Where?

19        Q.  Section 2.1.

20        A.  Yes.

21        Q.  It says $586,168.

22        A.  Yes.

23        Q.  Whose debt was that?

24        A.  It's the debt of Antico to Zuk Marble, I

25   think.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                            July 23, 2010

                                                              25

1          Q.   You don't know?

2          A.   That's what I think.  The debt from

3     Zuk -- from Antico Stone, LLC to Zuk Marble.

4          Q.   Well, Zuk Marble was the old name of Antico

5     Stone, wasn't it?

6          A.   Yes, but nothing to do with that.  There is

7     a company in Israel called Zuk Marble.

8          Q.   So Antico Stone didn't owe any money to MZAY

9     of Florida, Inc., did it?

10         A.   Antico Stone didn't owe any money to MZ, no.

11    But Antico Stone owes money to Zuk Marble, and a lot

12    of money.

13         Q.   So why didn't you pay the money to Zuk

14    Marble instead of MZAY, Inc.?

15         A.   Because Moshe Zuk is the owner of Zuk

16    Marble, and that's the way we want to address it.

17         Q.   If you could turn, please, over to the

18    previous page, Article I, 1.1, it refers in the

19    third line there to an Exhibit A.

20         A.   Um-hm.

21         Q.   Do you see that?

22         A.   Yeah.

23         Q.   Where is Exhibit A?  It wasn't attached to

24    the agreement you filed in court.

25         A.   What is this?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                                    July 23, 2010

26

1          Q.   Is that the Exhibit A?

2               THE WITNESS:   Is this it, Danny?

3          Q.   Okay.

4          A.   I think so.

5          Q.   Now, the inventory listed there, $3,398,709,

6     that was the inventory of Antico Stone, LLC?

7          A.   Yes.

8          Q.   And that's what it was worth on June 30,

9     2009?

10         A.   Yes.

11         Q.   And that's the inventory that was located at

12    2001 N.W. 44th Street, Pompano Beach, correct?

13         A.   Majority, yes.

14         Q.   Where else was it located?

15         A.   Some in New York.

16         Q.   How much of it was at 2001?

17         A.   2.5.

18         Q.   Was in New York or in Pompano?

19         A.   Pompano.

20         Q.   See on Exhibit B where it says loan from HR?

21         A.   Um-hm.

22         Q.   Who is HR?

23         A.   Somebody that I borrowing money to try to

24    help me to move forward.

25         Q.   Directing your attention, sir, to page 3 of



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                            July 23, 2010

27

1      the agreement, section 3.2 --
2           A.  Yeah.
3           Q.  -- under B there is a reference to the board
4      of directors of Antico Stone, LLC.  Do you see that?
5           A.  No.  Where?
6           Q.  B.  That they have full authority from their
7      board of directors.  Do you see that?
8           A.  Yeah.
9           Q.  Who was on the board of directors at the
10     time that this agreement was entered into?
11          A.  The board of directors of Antico Stone?
12          Q.  Yes, sir.
13          A.  Myself.
14          Q.  Anybody else?
15          A.  No.
16          Q.  Were you the sole member of Antico Stone,
17     LLC as of June 30, 2009?
18          A.  I was the only owner, yes.
19          Q.  You see paragraph C, 3.2(c), the next line?
20          A.  3.2(c), yes.
21          Q.  It says there are no liens.
22          A.  Okay.
23          Q.  There were liens, weren't there?
24          A.  I don't know.
25          Q.  Wasn't there a lien in favor of Citibank?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                                    July 23, 2010

28

1          A.   I don't know.  Maybe.

2          Q.   You don't know?

3          A.   No.

4          Q.   You owed well over a million dollars --

5          A.   I know.

6          Q.   -- to Citibank at that time, right?

7          A.   I know.

8          Q.   Didn't you sign UCC Lien Statements in

9     connection with that loan?

10         A.   I don't remember.  Maybe I did.  It makes

11    sense that I did, but I don't remember.

12        *Q.   Why did you tell MZAY of Florida, Inc. that

13    there were no liens if Citibank did have a lien?

14         A.   I didn't have a choice.  I have to --

15         Q.   Why not?

16         A.   Because -- you took me back to that time.

17              MR. GASS:  Can you repeat the question,

18    please.

19              *(Question read).

20         A.   I don't know.  I don't know.

21              (Documents marked as Exhibits 3 and 4

22                   for identification)

23         Q.   I show you what's been marked as Exhibits 3

24    and 4, which are Commercial Security Agreements, one

25    signed by Ciottolo, LLC, and the other signed by



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                                    July 23, 2010

29

1     Antico Stone, LLC.  Can you please look at those and

2     confirm that you signed both of them?

3               MR. GASS:  Is it a composite?  I only got

4          one of these.

5               MR. STRAUCH:  Which one do you need?

6               MR. GASS:  Is this a composite exhibit?

7               MR. ROSENTHAL:  No, 3 and 4.

8               MR. GASS:  Which one is 3?

9               MR. ROSENTHAL:  Three is Ciottolo and

10         4 is Antico Stone.  Excuse me, 3 is Antico Stone

11         and 4 is Ciottolo.

12         Q.  You signed those agreements on behalf of

13    both of those companies, right?

14         A.  I did.

15         Q.  Those agreements gave a lien, did they not,

16    to Citibank on all of the inventory of those two

17    companies, correct?

18         A.  Correct.

19         Q.  And you signed those in 2006, right?

20         A.  If that's the date, yeah.

21         Q.  And you never paid the money back to

22    Citibank that was owed in connection with these

23    liens, did you?

24         A.  I paid them interest during the years, and I

25    got into a very bad situation.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                           July 23, 2010

                                                              30

1          Q.  At the time that you sold the inventory,

2    Antico Stone sold the inventory to MZAY, Inc., you

3    still owed -- Antico Stone and Ciottolo still owed

4    Citibank over a million dollars, right?

5          A.  Yes.

6          Q.  So at that time the lien that you granted on

7    behalf of both these companies still applied to all

8    of the inventory, correct?

9          A.  I need to pay them.  I'm not running from

10   not paying them.  I want to pay, but I run into

11   really difficult times that I need to find a way to

12   do it, because otherwise I lost a bunch of things.

13         Q.  Sir, the question was whether the liens on

14   the inventory evidenced by Exhibits 3 and 4 were

15   still attached to the inventory at the time that you

16   sold the inventory to MZAY, correct?

17              MR. GASS:  Objection.  Asks for a legal

18         conclusion.

19         Q.  Correct?

20         A.  Probably according to -- I don't know.

21         Q.  You don't know?

22         A.  If I signed -- probably.  Probably.

23         Q.  Where is the bill of sale for the assets as

24   set forth in section 3.1 of the agreement?

25         A.  The what?



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                                July 23, 2010

                                                                    31

1           Q.   The bill of sale, 3.1.  It's on page 3.

2           A.   I don't know where it is.

3           Q.   You don't know where it is?

4           A.   No.

5           Q.   Was there a bill of sale?

6           A.   I think so, but maybe I have to look for

7      some documents, but I don't know.

8           Q.   Who owns the building at 2001 N.W. 44th

9      Street?

10          A.   Me and my wife.

11          Q.   Personally?

12          A.   Yahav Properties is the owner of this

13     building.

14          Q.   And who owns Yahav Properties?

15          A.   Myself and my wife.

16          Q.   Is there a lease between MZAY of Florida,

17     Inc. and Yahav Properties for the building?

18          A.   Lease, yeah.

19          Q.   When was that lease entered into?

20          A.   More or less at the same time that MZAY took

21     control of the company.

22          Q.   And you own 50 percent of MZAY of Florida,

23     Inc., correct?

24          A.   No.

25          Q.   What percentage?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                                          July 23, 2010

                                                                            32

1          A.   Five percent.

2          Q.   And Mr. Zuk owns 95 percent?

3          A.   Yes.

4          Q.   How many employees work at that location?

5          A.   Around 30.

6          Q.   And is that how many were working there at

7     the time of the Net Asset Sale Agreement?

8          A.   More or less, five here, five there.   I

9     don't remember exactly.

10         Q.   And the same employees that were working

11    there for Antico Stone and Ciottolo, they stayed and

12    began working for MZAY, correct?

13         A.   That's correct.

14         Q.   Directing your attention, sir, to your

15    affidavit, it's Exhibit 2, if you could please look

16    at paragraph 6.  If you can read it to yourself, and

17    then I'm going to ask you a question or two about

18    it, please.

19         A.   Okay.  I read.

20         Q.   Okay.  Who owns the inventory that you are

21    referring to in paragraph 6?

22         A.   Owned in the past, you mean?  I don't

23    understand.

24         Q.   It says here the inventory is no longer

25    owned by Antico Stone.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                              July 23, 2010

33

1        A.   MZ owns.   MZAY.

2             MR. ROSENTHAL:   Let's have this marked as

3        the next exhibit, please.

4                  (Document marked as Exhibit 5

5                    for identification)

6        Q.   Mr. Yahav, I show you what's been marked as

7        Exhibit 5.

8             MR. ROSENTHAL:   Counsel, I apologize, this

9        is the only copy that I have.

10       Q.   This is a listing that I printed out this

11       morning of all of the corporate entities --

12            MR. GASS:   Do you want me to make copies?

13       Q.   If I can ask the questions, we will get

14       copies of all the exhibits and make sure that you

15       have them.

16            It's a listing, is it not, of all the

17       companies in Florida that you have an interest,

18       correct?

19       A.   No.

20       Q.   Are there others?

21       A.   There are things that don't belong to me.

22       Q.   What's your wife's name?

23       A.   Lyla.

24       Q.   So everything up, down, through that has

25       your name, Avi Yahav, that's the only ones that I'm



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

34

1      asking you.

2          A.  Okay.

3          Q.  Please, sir, read it to yourself, otherwise

4      the court reporter has to take it down.

5          A.  Up to Yahav Investments, up to AI Homes,

6      yes.

7              MR. ROSENTHAL:  This will be the next

8          exhibit, please.

9                  (Document marked as Exhibit 6

10                   for identification)

11         Q.  Mr. Yahav, I show you what's been marked as

12     Exhibit 6, which is a printout from the Florida

13     Department of State Division of Corporations for a

14     corporation called Antico Stone & Tile Collection,

15     Inc.  We were talking about it earlier?

16         A.  Yeah.

17         Q.  Can you confirm that that is a printout of

18     your company of which you and Mr. Zuk --

19         A.  No, it's not.

20         Q.  It's not?

21         A.  This is a printout, but I told you that

22     before.  This company does nothing here.

23         Q.  Did you set up that company with Mr. Zuk?

24         A.  Yes, I did.

25         Q.  Okay.  And you and Mr. Zuk were the officers



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                                     July 23, 2010

                                                                       35

1        and directors and owners of that company, correct?

2            A.   Yeah, but there is nothing here.

3            Q.   It was filed in May of 2009, correct?

4            A.   Yes.

5            Q.   We talked earlier about a Web site called

6        Antico Stone & Tile.

7            A.   Yes.

8            Q.   That's your company, correct?

9            A.   Yes.

10           Q.   And that's your Web site, correct?

11           A.   Yes.  Yes.

12           Q.   You and Mr. Zuk, correct?

13           A.   Antico Stone & Tile, yes.

14                    (Document marked as Exhibit 7

15                        for identification)

16           Q.   Mr. Yahav, I show you what's been marked as

17       Exhibit 7 and ask if you can confirm for me that

18       that is a composite exhibit of the pages on your Web

19       site for Antico Stone & Tile?

20                MR. GASS:  He is referencing the entire

21           exhibit.

22                THE WITNESS:  Huh?

23                MR. GASS:  The entire exhibit.

24                As a courtesy, I believe 15 minutes from now

25           we should start heading down to the courthouse.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

36

1        A.   Yeah.

2        Q.   On the last two pages there are locations

3    listed.

4        A.   Um-hm.

5        Q.   Do you see that?

6        A.   Yes.

7        Q.   You have the 2001 address in Pompano Beach.

8    Do you continue to operate your companies at the

9    other locations as well?

10       A.   The first one, yes.

11       Q.   Carlstadt, New Jersey?

12       A.   Carlstadt, New Jersey, yes.  Tampa we are

13   about to close.  In Jupiter it's a showroom.  And in

14   Ajami just -- the last one, I'm not operating out of

15   the last one.

16       Q.   What about the one in Jupiter?

17       A.   I think it's about to close or something.  I

18   don't know.

19       Q.   Is any of the inventory --

20       A.   No.

21       Q.   Sir, if I could finish my question.

22            Is any of the inventory that was pledged to

23   Citibank located anywhere other than the Pompano

24   Beach store?

25       A.   In New Jersey.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                                    July 23, 2010

37

1      Q.  Now, the store in New Jersey, was that

2   business sold to MZAY of Florida, Inc. also?

3      A.  The store in New Jersey, yes.

4      Q.  By whom?  Who owned it before MZAY?

5      A.  I did.

6      Q.  What company?

7      A.  Antico Stone.

8      Q.  Antico Stone or Ciottolo or both?

9      A.  Both -- no.  Ask the question again.

10     Q.  Who owned and operated the business in New

11  Jersey?

12     A.  Antico Stone and Ciottolo.

13     Q.  Now, the Net Assets Sale Agreement, did that

14  also include the inventory in New Jersey?

15     A.  Yes.

16     Q.  And the inventory in New Jersey, after it

17  was sold pursuant to the Net Asset Sale Agreement,

18  the inventory stayed in the same place, the

19  employees were the same?

20     A.  No.  The inventory stayed, but I had a

21  partner over there that Moshe Zuk fired him.

22  Basically the guy let him go.  I had somebody to run

23  the show -- the majority of my problem came from

24  this New Jersey location.  I put a lot of money over

25  there, I put a lot of inventory, and this guy was --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                          July 23, 2010

                                                              38

1      you see where we stand.

2          Q.  But the same situation in New Jersey is the

3      one that applied in Pompano Beach, you and Mr. Zuk

4      continued to operate the business, just through a

5      different entity, correct?

6          MR. GASS:  Object to the form of the

7          question.  It's misleading and it's

8          inappropriately stating in his testimony.

9          Q.  Could you answer the question, please?

10         A.  Can you repeat the question?

11         Q.  After the Net Asset Sale Agreement

12     identified as Exhibit 1, you and Mr. Zuk continued

13     to operate the business in New Jersey as you

14     continued to operate the business in Pompano Beach,

15     correct?

16         MR. GASS:  Object to the form.  It's

17         misstating his prior testimony.

18         MR. ROSENTHAL:  You have already objected to

19         it.

20         MR. GASS:  I would like you to rephrase this

21         so it doesn't say "continued" when he testified

22         that it wasn't that way.

23         MR. ROSENTHAL:  Okay.

24         Q.  Prior to the Net Asset Sale Agreement, you

25     operated Antico Stone and Ciottolo, and Mr. Zuk was



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                                    July 23, 2010

39

1        your purchasing agent and supplier, correct?

2            A.   Yes.

3            Q.   After he had been a co-owner of both

4        companies, correct?

5            A.   He was co-owner?

6            Q.   Yes, of Antico Stone?

7            A.   What are you saying?

8            Q.   Up until 5 years ago Mr. --

9            A.   Five years ago I don't think that Antico New

10       Jersey was there.

11           Q.   When did it open in New Jersey?  Before the

12       Citibank loan, right?

13           A.   Yes.

14           Q.   And that was in 2006, right?

15           A.   The Citibank loan was in 2006?

16           Q.   Yes.

17           A.   Yes.

18           Q.   At the time that you took the Citibank loan

19       out, Mr. Zuk was your supplier and your purchasing

20       agent, correct?

21           A.   At the time that I took the loan?

22           Q.   Yes.

23           A.   He supplied, yeah, and I purchased some

24       materials by myself also, but, yeah.  I used him as

25       a supplier and purchasing agent, yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

40

1       Q.   When you say "you," you mean Antico Stone

2    and Ciottolo?

3       A.   Antico Stone and Ciottolo, yes.

4       Q.   And when you opened the New Jersey store,

5    your relationship with Mr. Zuk as you described

6    continued in that store as it did in the Pompano

7    Beach store, correct?

8       A.   Define "relationship."

9       Q.   Purchasing agent?

10      A.   Yes.

11      Q.   Supplier?

12      A.   Yes.

13      Q.   Right?

14      A.   Yes.

15      Q.   And Mr. Zuk knew, did he not --

16      A.   About?

17      Q.   -- that you were taking out the loan with

18   Citibank?

19      A.   I don't know.

20      Q.   You didn't discuss with him that you were

21   borrowing about a million and a half dollars from

22   Citibank in 2006?

23      A.   No.  He was not part of my business.

24      Q.   I thought you said he was part of your

25   purchasing agent and your supplier?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                        July 23, 2010

41

1       A.  But he was not the owner of the business, he

2    didn't run any financial stuff.

3       Q.  I didn't ask you about any of that.

4       A.  No, I don't know if he knew.

5       Q.  Did any of the money that you borrowed go to

6    pay him anything?

7       A.  Maybe paid him and suppliers.

8       Q.  How much did you pay to him out of the

9    million dollars?

10      A.  I don't know.  I buy and sell.  I sell, I

11   pay to suppliers.  I knew he was part of supplier,

12   he got money, yes, absolutely.

13      Q.  Was he your main supplier?

14      A.  Before?

15      Q.  2006 when you borrowed the money from

16   Citibank, what percentage --

17      A.  I need to check.  I don't think that he was

18   my main supplier.

19      Q.  More than half?

20      A.  I don't remember.

21      MR. ROSENTHAL:  Why don't we take a 5-minute

22   break, and I will see if we can get this wrapped

23   up so we can get down to court.

24      (Recess taken from 9:51 a.m. to 10:01 a.m.)

25

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                          July 23, 2010

42

1                    CONTINUED DIRECT EXAMINATION

2          BY MR. ROSENTHAL:

3          Q   Mr. Yahav, why didn't you tell Citibank

4    about the Net Asset Sale Agreement?

5          A.  I was under a lot of pressure and I don't

6    know.  There is no -- I don't know.  I was never

7    intend not to pay Citibank.  I'm still going to find

8    solution to pay them, but I got into --

9          Q.  You agreed when you entered into the loan

10   that if you didn't pay it back, they could take your

11   inventory, right?  That's what the collateral was,

12   right?

13         A.  Probably, yes.

14         Q.  Probably or is?

15         A.  Probably, yes.

16             MR. GASS:  Objection.  Asking for a legal

17   conclusion.

18         Q.  You understood that when you got the loan

19   from Citibank, that you were pledging as collateral

20   your inventory, right?

21         A.  I don't know.  Maybe.

22         Q.  You don't know?

23         A.  I try to make the right decision at that

24   time in order to make sure that the company

25   continued to run.  Remember, I have 35 employees



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

43

1    over there that need to get salaries, that need to

2    get paid.  I'm in the middle of the worst economic

3    crisis that still continues, and I don't know.  It

4    was couple of very, very bad years.

5         MR. ROSENTHAL:  This deposition was taken

6         for the limited purpose of dealing with the

7         order to show cause hearing.  I reserve the

8         right to take a more complete deposition in this

9         lawsuit in the event the litigation proceeds.

10        Other than that, I'm finished for today.

11        MR. GASS:  Thank you.

12        MR. ROSENTHAL:  You can't read because there

13        is not enough time, but it is our intention to

14        submit the transcript to the Court when the

15        court reporter gets there.  She is going to have

16        a laptop there so the Court will be able to read

17        it.

18        MR. GASS:  You can ask the questions that

19        you need to impeach.

20        (Thereupon, the deposition was concluded

21                  at 10:04 a.m.)

22

23

24

25



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                          July 23, 2010

44

1                      CERTIFICATE OF OATH

2

3      STATE OF FLORIDA            )

4      COUNTY OF BROWARD           )

5

6

7          I, Tamra K. Piderit, Florida Professional

8      Reporter, Registered Professional Reporter,

9      Certified Realtime Reporter, Certified LiveNote

10     Reporter, and Notary Public in the State of Florida,

11     certify that AVI YAHAV personally appeared before me

12     on the 23rd day of July, 2010, and was duly sworn.

13

14         Signed this 29th of July, 2010.

15

16

17

18

19     _____

       Tamra K. Piderit

20     Florida Professional Reporter

       Registered Professional Reporter

21     Certified Realtime Reporter

       Certified LiveNote Reporter

22     Notary Public, State of Florida

       My Commission #DD740616

23     Expires January 19, 2012

24

25



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                             July 23, 2010

45

1                    CERTIFICATE OF REPORTER
2
3        STATE OF FLORIDA      )
4        COUNTY OF BROWARD      )
5
6              I, TAMRA K. PIDERIT, Florida
   Professional Reporter, Registered Professional
7  Reporter, Certified Realtime Reporter, and Certified
   LiveNote Reporter, do hereby certify that I was
8  authorized to and did stenographically report the
   deposition of AVI YAHAV; that a review of the
9  transcript was not requested; and that the foregoing
   transcript, pages 1-43, is a true record of my
10 stenographic notes.
11
               I further certify that I am not a
12 relative, employee, or attorney, or counsel of any
   of the parties, nor am I a relative or employee of
13 any of the parties' attorney or counsel connected
   with the action, nor am I financially interested in
14 the action.
15
               Dated this 29th day of July, 2010.
16
17
18
19
                    _____
20                  Tamra K. Piderit
                    Florida Professional Reporter
21                  Registered Professional Reporter
                    Certified Realtime Reporter
22                  Certified LiveNote Reporter
23
24
25



Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                        July 23, 2010

46

| A | agreements | 39:9 40:1,3 | 25:23 30:15 | 1:15 2:2,10 |
|---|---|---|---|---|
| **able** | 28:24 29:12 | **anybody** | **attention** | 29:12 30:7 |
| 43:16 | 29:15 | 13:4 18:2 | 18:5 20:10 | **believe** |
| **absolutely** | **AI** | 27:14 | 26:25 32:14 | 9:14 12:15 |
| 41:12 | 34:5 | **apologize** | **attorney** | 15:9 16:4,8 |
| **action** | **Ajami** | 33:8 | 45:12,13 | 22:23 35:24 |
| 45:13,14 | 36:14 | **APPEARANCES** | **authority** | **belong** |
| **active** | **al** | 2:1 | 27:6 | 33:21 |
| 9:2 10:5,5,7 | 1:9 | **appeared** | **authorized** | **belonged** |
| 10:8,8 | **Alan** | 44:11 | 45:8 | 23:17 |
| **activity** | 2:4 | **applied** | **Avi** | **bill** |
| 8:24 16:12 | **allow** | 30:7 38:3 | 1:14 3:3 4:5 | 30:23 31:1,5 |
| **address** | 12:14 | **appreciate** | 4:8 5:2,16 | **bit** |
| 5:21 6:4 | **allowed** | 9:17 11:17 | 5:22,25 | 22:25 24:7 |
| 7:17,22,24 | 9:18 14:13 | 12:11 | 6:20 11:7 | **Black** |
| 10:25 23:15 | 18:17 | **argue** | 13:11 33:25 | 5:22 |
| 25:16 36:7 | **amount** | 19:10 | 44:11 45:8 | **board** |
| **affidavit** | 15:1 | **argumenta...** | **aware** | 27:3,7,9,11 |
| 4:8 13:19 | **answer** | 9:8 10:10 | 12:8,9 | **Boca** |
| 20:17 21:1 | 18:22 19:9 | 16:24 | **AY** | 5:23 |
| 21:9 22:10 | 38:9 | **arosentha...** | 6:8,19 | **borrowed** |
| 22:16 32:15 | **answered** | 2:7 | **a.m** | 41:5,15 |
| **agent** | 17:15 | **Article** | 1:17,17 | **borrowing** |
| 4:13 15:21 | **Antico** | 23:25 25:18 | 41:24,24 | 26:23 40:21 |
| 16:1 17:13 | 1:8 4:4,9,16 | **asked** | 43:21 | **bottom** |
| 39:1,20,25 | 8:5,18 9:1 | 17:15 19:17 | | 13:22 |
| 40:9,25 | 10:3,15,18 | **asking** | **B** | **break** |
| **ago** | 10:22 13:10 | 18:23 19:12 | **B** | 41:22 |
| 8:16,17 14:3 | 14:10,16,22 | 19:21 20:25 | 26:20 27:3,6 | **BROWARD** |
| 14:15,15 | 14:23 15:15 | 34:1 42:16 | **back** | 1:1 44:11 |
| 15:16 17:7 | 15:22 17:11 | **Asks** | 12:16 14:25 | 45:4 |
| 20:17 21:1 | 17:20 18:7 | 30:17 | 23:25 28:16 | **building** |
| 21:2 39:8,9 | 18:13 19:19 | **Asset** | 29:21 42:10 | 31:8,13,17 |
| **agreed** | 20:13,20,23 | 13:14 17:19 | **bad** | **bunch** |
| 42:9 | 21:8,13,19 | 23:3 32:7 | 29:25 43:4 | 30:12 |
| **agreement** | 22:11,21,22 | 37:17 38:11 | **banking** | **business** |
| 4:9,10 13:14 | 23:17 24:1 | 38:24 42:4 | 1:4 | 6:4 7:13,25 |
| 15:1,5 | 24:24 25:3 | **assets** | **basically** | 8:1 10:11 |
| 17:19,21 | 25:4,8,10 | 30:23 37:13 | 17:8 37:22 | 10:14 15:19 |
| 18:11 19:18 | 25:11 26:6 | **assist** | **Beach** | 16:19,21 |
| 23:4,10,25 | 27:4,11,16 | 18:17,23,24 | 6:5 26:12 | 17:3 23:15 |
| 24:2,9,11 | 29:1,10,10 | **assisting** | 36:7,24 | 23:22 37:2 |
| 25:24 27:1 | 30:2,3 | 19:6 | 38:3,14 | 37:10 38:4 |
| 27:10 30:24 | 32:11,25 | **association** | 40:7 | 38:13,14 |
| 32:7 37:13 | 34:14 35:6 | 1:5 | **began** | 40:23 41:1 |
| 37:17 38:11 | 35:13,19 | **attached** | 32:12 | **buy** |
| 38:24 42:4 | 37:7,8,12 | 4:22 13:13 | **behalf** | 14:23 41:10 |
| | 38:25 39:6 | | | |



Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                                July 23, 2010

47

| | | | | |
|---|---|---|---|---|
| **C** | 32:11 37:8 | 12:22 14:2 | 13:9 33:9 | 35:25 |
| C | 37:12 38:25 | 14:10,20,25 | corporate | co-owner |
| 5:1 27:19 | 40:2,3 | 15:8,21,25 | 33:11 | 39:3,5 |
| CACE | CIRCUIT | 16:2,4,8,13 | corporation | crime |
| 1:3 | 1:1,1 | 16:18 25:7 | 11:3 34:14 | 9:23 |
| call | Citibank | 31:21 34:18 | Corporations | crisis |
| 15:21 16:12 | 1:4 17:22 | 34:22,23 | 4:12,14 | 43:3 |
| 22:19 | 21:22,24 | 35:1,8 37:6 | 34:13 | CRR |
| called | 22:1,4 | 42:24 | correct | 1:25 |
| 8:4,18 10:2 | 27:25 28:6 | complete | 6:20,21,23 | |
| 10:14 14:19 | 28:13 29:16 | 43:8 | 6:24 7:1,9 | **D** |
| 15:25 16:2 | 29:22 30:4 | composite | 7:13,18 8:1 | D |
| 25:7 34:14 | 36:23 39:12 | 29:3,6 35:18 | 8:5,13,14 | 5:1 |
| 35:5 | 39:15,18 | concluded | 8:22 9:21 | Daniel |
| Carlstadt | 40:18,22 | 43:20 | 10:16 11:1 | 1:20 2:11,12 |
| 36:11,12 | 41:16 42:3 | conclusion | 11:4,8,11 | Danny |
| CARLTON | 42:7,19 | 30:18 42:17 | 14:11,17 | 26:2 |
| 2:3 | close | conduct | 15:19 17:4 | date |
| case | 36:13,17 | 7:25 | 17:14 23:15 | 15:16 29:20 |
| 1:3 13:20 | closed | confirm | 23:23 26:12 | Dated |
| cash | 8:25 9:1 | 13:18 29:2 | 29:17,18 | 45:15 |
| 24:1,3 | CLR | 34:17 35:17 | 30:8,16,19 | day |
| cause | 1:25 | confused | 31:23 32:12 | 44:12 45:15 |
| 4:6 5:10 | collateral | 22:25 | 32:13 33:18 | days |
| 13:12 43:7 | 21:21,23,24 | confusing | 35:1,3,8,10 | 20:16 21:1,2 |
| CERTIFICATE | 22:1,2 | 24:7 | 35:12 38:5 | DD740615 |
| 44:1 45:1 | 42:11,19 | connected | 38:15 39:1 | 44:22 |
| Certified | Collection | 45:13 | 39:4,20 | dealing |
| 5:7,8 44:9,9 | 10:3,22 | connection | 40:7 | 43:6 |
| 44:21,21 | 34:14 | 28:9 29:22 | counsel | debt |
| 45:7,7,21 | come | continue | 2:1 11:14 | 24:17,23,24 |
| 45:22 | 17:8 | 36:8 | 17:16 18:21 | 25:2 |
| certify | Commercial | continued | 19:5 33:8 | decision |
| 44:11 45:7 | 4:9,10 28:24 | 17:10,12 | 45:12,13 | 42:23 |
| 45:11 | Commission | 23:21 38:4 | COUNTY | DEFENDANT |
| change | 44:22 | 38:12,14,21 | 1:1 44:4 | 2:10 |
| 14:21 | companies | 40:6 42:1 | 45:4 | Defendants |
| changed | 16:20 29:13 | 42:25 | couple | 1:10 4:4 |
| 6:2 | 29:17 30:7 | continues | 14:21 43:4 | 13:10 |
| check | 33:17 36:8 | 19:15 43:3 | court | Define |
| 41:17 | 39:4 | continuously | 1:1 4:22 | 40:8 |
| choice | company | 17:2 | 5:11 13:19 | Department |
| 28:14 | 1:8,9 8:4,7 | control | 25:24 34:4 | 4:12,14 |
| Ciottolo | 8:9,12,18 | 17:8 31:21 | 41:23 43:14 | 34:13 |
| 1:8 4:11 | 8:19,21,23 | copies | 43:15,16 | deposition |
| 28:25 29:9 | 8:24 9:2 | 33:12,14 | courtesy | 1:13 5:2,5 |
| 29:11 30:3 | 10:2,4,12 | copy | 35:24 | 19:16 43:5 |
| | 10:17 11:7 | | courthouse | |



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                          July 23, 2010

48

| | | | | |
|---|---|---|---|---|
| 43:8,20 | 5:17 44:12 | exactly | FIELDS | follows |
| 45:8 | d/b/a | 12:19 21:10 | 2:3 | 5:18 |
| describe | 10:18 | 23:1 24:7,8 | filed | foregoing |
| 8·2 | | 32:9 | 11:3 25:24 | 45:9 |
| described | **E** | EXAMINATION | 35:3 | foreigner |
| 40:5 | E | 3:1,4 5:19 | files | 7:19 |
| Description | 2:4 5:1,1 | 42:1 | 15:13 | forgiven |
| 4:3 | earlier | examined | financial | 24:17 |
| Detail | 34:15 35:5 | 5:17 | 41:2 | form |
| 4:14 | earned | excuse | financially | 9:15 11:19 |
| different | 15:3 | 20:19 29:10 | 45:13 | 11:21,25 |
| 38:5 . | economic | exhibit | find | 12:7 14:12 |
| difficult | 43:2 | 13:9,17 14:2 | 18:19 19:2,4 | 16:23 17:17 |
| 30:11 | education | 17:20 18:5 | 30:11 42:7 | 38:6,16 |
| direct | 12:11 | 18:14 20:18 | finding | formerly |
| 3:4 5:19 | either | 22:10 23:4 | 12:5 19:6 | 6:1 |
| 20:10 42:1 | 17:24 18:3 | 25:19,23 | finish | Fort |
| directing | employed | 26:1,20 | 9:9 12:14 | 1:22 2:13 |
| 18:5 24:9 | 6:7,8 | 29:6 32:15 | 36:21 | forth |
| 26:25 32:14 | employee | 33:3,4,7 | finished | 30:24 |
| directors | 45:12,12 | 34:8,9,12 | 12:15 43:10 | forward |
| 11:6,10 27:4 | employees | 35:14,17,18 | fired | 26:24 |
| 27:7,9,11 | 32:4,10 | 35:21,23 | 37:21 | Four |
| 35:1 | 37:19 42:25 | 38:12 | first | 8:17 |
| discipline | English | exhibits | 36:10 | FPR |
| 19:14 | 19:23 20:4,6 | 4:1,2,22 | five | 1:25 |
| discuss | entered | 13:6 28:21 | 32:1,8,8 | Friday |
| 40:20 | 27:10 31:19 | 28:23 30:14 | 39:9 | 1:17 |
| distribution | 42:9 | 33:14 | Florida | front |
| 7:14 | entire | Expires | 1:1,8,9,22 | 18:13 |
| Division | 35:20,23 | 44:23 | 2:6,13 4:12 | full |
| 1:2 4:12,14 | entities | explain | 4:14 5:6,9 | 27:6 |
| 34:13 | 33:11 | 21:3 | 5:23 6:6,11 | fully |
| document | entity | | 6:19 10:19 | 20:24 |
| 13:15 33:4 | 4:15 38:5 | **F** | 11:11 12:19 | further |
| 34:9 35:14 | error | fact | 12:22 14:1 | 45:11 |
| documents | 22:23 | 14:16 | 14:8 17:21 | |
| 13:6 28:21 | Esquire | familiar | 18:12 19:19 | **G** |
| 31:7 | 2:4,4,12 | 8:4,19 10:2 | 23:12,14,19 | G |
| doing | et | 13:14 16:2 | 23:21 24:1 | 1:20 2:11,12 |
| 15:3 | 1:9 | family | 25:9 28:12 | 5:1 |
| dollars | event | 6:2 | 31:16,22 | Gass |
| 28:4 30:4 | 43:9 | far | 33:17 34:12 | 1:20 2:11,12 |
| 40:21 41:9 | evidenced | 16:18 | 37:2 44:3,7 | 9:7,11,14 |
| Domestic | 30:14 | favor | 44:10,20,22 | 9:17 10:9 |
| 16:6 | exact | 27:25 | 45:3,6,20 | 11:13,17,19 |
| duly | 16:11 | Fax | fluently | 11:23,25 |
| | | 2:7 | 20:6 | |



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

12:4,8,10
12:11 13:19
14:12 16:23
17:15 18:17
18:23 19:3
19:6,10,14
20:3 28:17
29:3,6,8
30:17 33:12
35:20,23
38:6,16,20
42:16 43:11
43:18
GENERAL
1:2
give
5:12 9:20
12:12
go
19:11 37:22
41:5
going
9:7 10:9
11:14 12:12
12:14 15:2
23:25 32:17
42:7 43:15
granite
7:12,15,16
granted
30:6
Grantor
4:9,11
guy
37:22,25

H
half
40:21 41:19
hand
9:4
happened
10:6 24:8
happening
23:9
heading
35:25
heard

19:14
hearing
43:7
Held
1:20
help
26:24
holding
16:3,13,16
16:25
Holdings
16:6,9
Homes
34:5
hours
19:22
HR
26:20,22
Huh
35:22

I
idea
23:8
identific...
13:7 28:22
33:5 34:10
35:15
identified
14:1 17:19
38:12
II
23:25
impeach
43:19
inappropr...
38:8
include
37:14
Incorporated
6:11 9:1
10:3,23
14:1 16:7
18:12 23:12
23:14
INDEX
3:1 4:1

installing
7:16
insulting
20:4
intend
42:7
intention
43:13
interest
8:9,12 15:7
15:23 17:11
29:24 33:17
interested
45:13
Internati...
2:5
inventory
18:6 20:22
21:12,15,18
21:18,21
22:3,5,9,10
22:15,18
23:1,11,17
23:23 24:3
24:5 26:5,6
26:11 29:16
30:1,2,8,14
30:15,16
32:20,24
36:19,22
37:14,16,18
37:20,25
42:11,20
Investments
34:5
involved
15:18
Israel
7:20 15:25
25:7
Issued
4:7 13:13
issues
6:15

J
January
44:23

Jersey
36:11,12,25
37:1,3,11
37:14,16,24
38:2,13
39:10,11
40:4
JUDICIAL
1:1
July
1:17 5:3
44:12,14
45:15
June
23:18 26:8
27:17
Jupiter
36:13,16
JURISDICTION
1:2

K
1:25 5:5
44:7,19
45:6,20
keep
16:19
knew
40:15 41:4
41:11
know
7:4 11:13,13
11:15 12:20
18:2,19
22:6,7,8,25
22:25 24:8
25:1 27:24
28:1,2,5,7
28:20,20
30:20,21
31:2,3,7
36:18 40:19
41:4,10
42:6,6,21
42:22 43:3
known
6:1

L
Lane
5:23
language
19:23 20:5
laptop
43:16
Large
5:9
Lauderdale
1:22 2:13
Law
1:20 2:11
lawsuit
43:9
lawyer
18:15
lease
31:16,18,19
legal
5:24 6:14
30:17 42:16
Let's
21:17 33:2
Levy
12:18,23
liability
1:8,9 15:8
liar
9:12
lien
22:4 27:25
28:8,13
29:15 30:6
liens
27:21,23
28:13 29:23
30:13
limit
11:22
limited
1:8,9 9:15
12:6 15:8
43:6
line
25:19 27:19
liquidated



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                                    July 23, 2010

50

| | | | | |
|---|---|---|---|---|
| 18:7 20:22 | 32:24 | materials | 11:7 13:1 | 43:1,19 |
| 21:13 22:15 | look | 39:24 | 16:4 22:20 | Net |
| List | 15:11,12 | matter | 25:15 37:21 | 13:14 17:19 |
| 4:13 | 19:3 29:1 | 5:13 | Motion | 23:3 32:7 |
| listed | 31:6 32:15 | mean | 4:6 13:11 | 37:13,17 |
| 26:5 36:3 | looking | 9:22 10:20 | move | 38:11,24 |
| listing | 12:21 | 21:17 22:16 | 26:24 | 42:4 |
| 33:10,16 | lost | 22:18 32:22 | mstrauch@... | never |
| litigation | 30:12 | 40:1 | 2:8 | 9:2 10:5 |
| 43:9 | lot | means | MZ | 17:21,24 |
| little | 12:9 25:11 | 9:23 | 6:22 10:1 | 29:21 42:6 |
| 24:7 | 37:24,25 | member | 11:12 25:10 | New |
| live | 42:5 | 16:10,13,15 | 33:1 | 26:15,18 |
| 5:22 7:19 | Lyla | 27:16 | MZAY | 36:11,12,25 |
| lived | 33:23 | membership | 6:9,11,19 | 37:1,3,10 |
| 7:21 | L.L.C | 15:7,23 | 11:11 12:19 | 37:14,16,24 |
| LiveNote | 1:8 | Miami | 12:22 14:1 | 38:2,13 |
| 5:8 44:9,21 | | 2:6 | 14:6 17:9 | 39:9,11 |
| 45:7,22 | **M** | Michael | 17:14,20 | 40:4 |
| lives | M | 2:4 | 18:12 19:19 | Northwest |
| 7:20 | 6:8,10 10:18 | middle | 20:13,19,21 | 1:21 2:12 |
| LLC | main | 43:2 | 23:11,14,18 | Notarized |
| 1:8 4:4,5,9 | 41:13,18 | million | 23:21 24:1 | 13:24 |
| 4:11 8:5 | majority | 28:4 30:4 | 24:5,6,13 | Notary |
| 13:10,11 | 26:13 37:23 | 40:21 41:9 | 25:8,14 | 5:8 44:10,22 |
| 14:10,16,24 | making | minutes | 28:12 30:2 | notes |
| 15:15,22 | 19:13 | 19:15 35:24 | 30:16 31:16 | 45:10 |
| 16:3,16,25 | man | misleading | 31:20,22 | N.A |
| 17:12 21:19 | 20:4 | 11:20,24 | 32:12 33:1 | 1:4 |
| 22:11 24:2 | manager | 12:1,5 | 37:2,4 | N.W |
| 25:3 26:6 | 16:9,15 | 14:14 38:7 | | 6:5 7:18 |
| 27:4,17 | Managing | misstating | **N** | 10:25 17:4 |
| 28:25 29:1 | 16:13 | 38:17 | N | 22:13 23:11 |
| loan | marble | moment | 5:1 | 26:12 31:8 |
| 21:22,24 | 7:13,15,16 | 14:3 | name | |
| 26:20 28:9 | 7:25 10:14 | money | 4:13,15 5:21 | **O** |
| 39:12,15,18 | 14:19 15:25 | 23:1 25:8,10 | 5:24 6:1,2 | O |
| 39:21 40:17 | 17:3 22:20 | 25:11,12,13 | 6:12,14,25 | 5:1 |
| 42:9,18 | 24:24 25:3 | 26:23 29:21 | 14:5,21 | oath |
| located | 25:4,7,11 | 37:24 41:5 | 25:4 33:22 | 9:4,19 44:1 |
| 26:11,14 | 25:14,16 | 41:12,15 | 33:25 | object |
| 36:23 | marked | months | national | 9:7 10:9 |
| location | 13:6,8,17 | 14:22 | 1:4 | 11:19 14:12 |
| 23:22 32:4 | 20:17 23:4 | morning | need | 38:6,16 |
| 37:24 | 28:21,23 | 33:11 | 15:12 18:15 | objected |
| locations | 33:2,4,6 | Moshe | 20:9 29:5 | 38:18 |
| 36:2,9 | 34:9,11 | 6:22,25 7:7 | 30:9,11 | objecting |
| longer | 35:14,16 | | 41:17 43:1 | 11:25 |



Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

objection
11:21,22
12:7,14
16:23 17:15
19:13 20:3
30:17 42:16
objections
9:15,16
11:16 17:16
17:17
obligation
18:12 19:19
20:13
OFFICE
2:11
Officer
4:12
officers
11:6,10
34:25
Offices
1:20
okay
10:1 16:11
20:10 21:10
23:14 24:10
26:3 27:22
32:19,20
34:2,25
38:23
old
15:12 25:4
Olive
5:22
ones
33:25
open
8:24 39:11
opened
40:4
operate
36:8 38:4,13
38:14
operated
37:10 38:25
operating
36:14

order
4:6 13:12
42:24 43:7
original
4:22,22
originally
14:19
owe
22:19 25:8
25:10
owed
28:4 29:22
30:3,3
owes
25:11
owing
23:2
owned
14:3,11 16:8
32:22,25
37:4,10
owner
25:15 27:18
31:12 41:1
owners
35:1
ownership
17:6,11
owns
12:22,25
31:8,14
32:2,20
33:1

P

P
5:1
page
3:2 4:3 20:2
25:18 26:25
31:1
pages
35:18 36:2
45:9
paid
22:3 24:3,5
24:13 29:21

29:24 41:7
43:2
paragraph
18:6 21:9
27:19 32:16
32:21
part
20:12 23:10
24:2 40:23
40:24 41:11
parties
45:12,13
partner
37:21
partners
17:5
pay
18:7,13
19:19 20:13
20:22 21:13
22:22 23:1
24:1,3
25:13 30:9
30:10 41:6
41:8,11
42:7,8,10
paychecks
6:15
paying
20:18,19
30:10
payment
21:8 22:19
penalty
9:20
percent
31:22 32:1,2
percentage
31:25 41:16
perjury
9:21,22
permissible
17:17
personally
31:11 44:11
physically
7:23

Piderit
1:25 5:5
44:7,19
45:6,20
place
2:5 23:19
37:18
Plaintiff
1:6,15 2:2
Plaintiff's
4:2,5 13:9
13:11
please
5:21 9:10,13
11:15,18
12:16 18:18
18:20 25:17
28:18 29:1
32:15,18
33:3 34:3,8
38:9
pledged
36:22
pledging
42:19
Pollo
13:24
Pompano
6:5 26:12,18
26:19 36:7
36:23 38:3
38:14 40:6
Prejudgment
4:6 13:12
president
12:18
pressure
42:5
previous
25:18
Price
20:11
printed
33:10
printout
4:16 34:12
34:17,21

prior
38:17,24
probably
30:20,22,22
42:13,14,15
problem
37:23
proceeds
43:9
process
9:12 12:12
Professional
5:6,7 44:7,8
44:20,20
45:6,6,20
45:21
prohibited
12:3,4
Properties
4:5 13:10
31:12,14,17
Public
5:8 44:10,22
Purchase
13:14 17:19
23:3
purchased
39:23
purchaser
24:17
purchasing
15:21,24
16:1 17:13
39:1,19,25
40:9,25
purpose
16:14 43:6
pursuant
37:17
put
12:20 37:24
37:25

Q

question
9:9,12 11:20
12:1,5,16



Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                                    July 23, 2010

| | | | | |
|---|---|---|---|---|
| 12:17 18:22 | 14:3 21:9 | **response** | 31:1,5 32:7 | 6:25 |
| 20:24 28:17 | 22:9 32:21 | 4:5 13:11 | 37:13,17 | **show** |
| 28:19 30:13 | **refers** | **retained** | 38:11,24 | 4:6 13:8,12 |
| 32:17 36:21 | 25:18 | 4:22 | 42:4 | 13:17 18:11 |
| 37:9 38:7,9 | **Registered** | **review** | **saying** | 19:18 20:15 |
| 38:10 | 4:13 5:6 | 45:8 | 6:24 12:4 | 24:13,14 |
| **questions** | 44:8,20 | **right** | 39:7 | 28:23 33:6 |
| 19:11 33:13 | 45:6,21 | 7:6 8:10 9:4 | **says** | 34:11 35:16 |
| 43:18 | **regularly** | 16:18 18:14 | 20:11 22:21 | 37:23 43:7 |
| | 7:24 | 22:11 23:5 | 22:21 24:13 | **showroom** |
| **R** | **relationship** | 23:12,19 | 24:16,21 | 36:13 |
| **R** | 7:10 40:5,8 | 28:6 29:13 | 26:20 27:21 | **sign** |
| 5:1 | **relative** | 29:19 30:4 | 32:24 | 23:4 28:8 |
| **raised** | 45:12,12 | 39:12,14 | **second** | **signature** |
| 9:3 | **remained** | 40:13 42:11 | 2:5 20:4 | 13:22 20:1 |
| **Raton** | 15:18 | 42:12,20,23 | **section** | **signed** |
| 5:23 | **remember** | 43:8 | 20:11,12 | 20:17 21:1,2 |
| **read** | 12:19 16:5 | **Rosenthal** | 24:16,19 | 23:3,7 |
| 12:16,17 | 16:11,18 | 2:4 3:4 5:20 | 27:1 30:24 | 28:25,25 |
| 18:18,20 | 17:1 18:16 | 9:9,14 | **Security** | 29:2,12,19 |
| 19:21 20:8 | 28:10,11 | 11:14,18,21 | 4:9,10 28:24 | 30:22 44:14 |
| 20:12 21:15 | 32:9 41:20 | 11:24 12:2 | **see** | **sir** |
| 28:19 32:16 | 42:25 | 12:6,9,15 | 15:14 18:7,9 | 6:4,17 9:3 |
| 32:19 34:3 | **repeat** | 17:16 18:21 | 20:23 21:12 | 10:7,13 |
| 43:12,16 | 10:1 14:5 | 18:25 19:5 | 21:13 24:11 | 11:15 12:6 |
| **really** | 28:17 38:10 | 19:9,12 | 24:15,16,17 | 19:24 20:6 |
| 30:11 | **rephrase** | 29:7,9 33:2 | 25:21 26:20 | 20:10,25 |
| **Realtime** | 38:20 | 33:8 34:7 | 27:4,7,19 | 21:5 22:16 |
| 5:7 44:9,21 | **Replevin** | 38:18,23 | 36:5 38:1 | 24:9 26:25 |
| 45:7,21 | 4:6 13:13 | 41:21 42:2 | 41:22 | 27:12 30:13 |
| **reason** | **report** | 43:5,12 | **sell** | 32:14 34:3 |
| 12:2 | 45:8 | **RPR** | 41:10,10 | 36:21 |
| **recall** | **Reported** | 1:25 | **sense** | **site** |
| 15:16 24:6 | 1:24 | **rules** | 28:11 | 4:16 10:13 |
| **Recess** | **reporter** | 11:22 12:3 | **sent** | 35:5,10,19 |
| 41:24 | 4:22 5:6,7,7 | **run** | 17:21 | **situation** |
| **record** | 5:8,11 34:4 | 30:10 37:22 | **September** | 29:25 38:2 |
| 45:9 | 43:15 44:8 | 41:2 42:25 | 16:10 | **sold** |
| **recorded** | 44:8,9,10 | **running** | **set** | 23:10,18 |
| 22:4 | 44:20,20,21 | 30:9 | 16:25 30:24 | 30:1,2,16 |
| **records** | 44:21 45:1 | | 34:23 | 37:2,17 |
| 15:10 | 45:6,7,7,7 | **S** | **setting** | **sole** |
| **reference** | 45:20,21,21 | **S** | 16:20 | 27:16 |
| 27:3 | 45:22 | 5:1 | **shares** | **solemnly** |
| **referencing** | **requested** | **salaries** | 15:2,15 | 5:11 |
| 35:20 | 45:9 | 43:1 | **sheet** | **solution** |
| **referring** | **reserve** | **sale** | 12:20 | 42:8 |
| | 43:7 | 17:14 30:23 | **shortened** | **somebody** |



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                              July 23, 2010

53

| | | | | |
|---|---|---|---|---|
| 21:3 26:23 | 9:1 10:3,14 | 15:20 17:13 | 14:15 | 10:4 17:24 |
| 37:22 | 10:15,18,22 | 39:1,19,25 | testified | 18:2,24 |
| sorry | 13:10 14:10 | 40:11,25 | 5:17 38:21 | 19:1,3 |
| 21:11 | 14:16,22,23 | 41:11,13,18 | testimony | 34:21 |
| sound | 15:15,22 | suppliers | 5:12 9:20 | transaction |
| 9:11 | 17:3,12,20 | 22:2 41:7,11 | 18:18 38:8 | 10:11 |
| Southeast | 18:7,13 | supposed | 38:17 | transcript |
| 2:5 | 19:20 20:13 | 20:18,19 | Thank | 4:22 43:14 |
| speak | 20:20,23 | sure | 11:18 43:11 | 45:9,9 |
| 9:18 20:6,7 | 21:8,13,19 | 6:13 9:11 | things | transfer |
| speaking | 22:11,21,22 | 33:14 42:24 | 12:10 30:12 | 15:2,7,14 |
| 9:16 11:16 | 23:18 24:2 | swear | 33:21 | transferred |
| specifically | 25:3,5,8,10 | 5:11 | think | 15:23 17:11 |
| 15:24 | 25:11 26:6 | swearing | 6:12 8:16 | tried |
| spell | 27:4,11,16 | 20:16 | 14:13 15:11 | 8:24 |
| 7:4 | 29:1,10,10 | swore | 22:1 24:6 | true |
| stand | 30:2,3 | 21:5 22:17 | 24:25 25:2 | 10:13 21:5 |
| 38:1 | 32:11,25 | sworn | 26:4 31:6 | 45:9 |
| stands | 34:14 35:6 | 5:17 21:1 | 36:17 39:9 | trust |
| 6:19,22 | 35:13,19 | 44:12 | 41:17 | 22:2 |
| start | 37:7,8,12 | | third | truth |
| 21:17 35:25 | 38:25 39:6 | T | 25:19 | 5:13,14,14 |
| started | 40:1,3 | take | thought | 9:23 |
| 14:16,25 | stop | 19:22 34:4 | 40:24 | try |
| state | 11:18 18:25 | 41:21 42:10 | Three | 20:3 26:23 |
| 4:12,14 5:9 | 19:5,12 | 43:8 | 29:9 | 42:23 |
| 5:21 34:13 | store | taken | tile | turn |
| 44:3,10,22 | 36:24 37:1,3 | 1:15 5:5 | 7:13,15,16 | 25:17 |
| 45:3 | 40:4,6,7 | 41:24 43:5 | 7:25 8:19 | two |
| statement | Strauch | talked | 9:1 10:3,14 | 29:16 32:17 |
| 19:1 | 2:4 29:5 | 35:5 | 10:15,18,22 | 36:2 |
| Statements | Street | talking | 17:3 34:14 | typing |
| 28:8 | 1:21 2:5,12 | 12:13 21:18 | 35:6,13,19 | 22:23 |
| stating | 6:5 7:18 | 34:15 | time | |
| 38:8 | 10:25 17:4 | Tampa | 8:11 15:1 | U |
| stayed | 22:13 23:11 | 36:12 | 17:14 20:9 | UCC |
| 23:19 32:11 | 26:12 31:9 | Tamra | 27:10 28:6 | 28:8 |
| 37:18,20 | stuff | 1:25 5:5 | 28:16 30:1 | Um-hm |
| stenographic | 41:2 | 44:7,19 | 30:6,15 | 6:16 25:20 |
| 45:10 | submit | 45:6,20 | 31:20 32:7 | 26:21 36:4 |
| stenograp... | 43:14 | tell | 39:18,21 | understand |
| 45:8 | submitted | 9:23 20:12 | 42:24 43:13 | 9:3,19,25 |
| Steve | 13:19 | 20:16 21:8 | times | 19:23 20:24 |
| 12:18 | Suite | 28:12 42:3 | 30:11 | 21:2,10 |
| stone | 1:21 2:13 | telling | today | 32:23 |
| 1:8 4:4,9,16 | supplied | 18:22 19:8 | 6:8 9:20 | understood |
| 8:1,5,18 | 39:23 | Ten | 17:6 43:10 | 9:6 23:7,8 |
| | supplier | | told | |



ESQUIRE

an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                    July 23, 2010

54

| | | | | |
|---|---|---|---|---|
| 42:18 | worst | 29:24 39:8 | **1** | **2000** |
| uses | 43:2 | 39:9 43:4 | | 14:25 |
| 7:24 | worth | **yesterday** | **1** | **2001** |
| | 26:8 | 13:20 | 4:4 13:6,9 | 6:5 7:17 |
| **V** | wrapped | York | 14:2 17:20 | 10:25 17:4 |
| v | 41:22 | 26:15,18 | 18:14 23:4 | 22:13 23:11 |
| 1:7 | Writ | Y-a-a-c-o... | 38:12 | 26:12,16 |
| | 4:6 13:12 | 6:3 | **1-43** | 31:8 36:7 |
| **W** | writing | | 45:9 | **2005** |
| waiting | 15:5,8 | **Z** | **1.1** | 17:10 |
| 22:3 | written | | 25:18 | **2006** |
| want | 18:15 | **Z** | **10** | 29:19 39:14 |
| 8:2 10:1 | wrong | 10:20,21 | 7:9,11 17:4 | 39:15 40:22 |
| 21:11 25:16 | 22:24 | zed | **10:01** | 41:15 |
| 30:10 33:12 | | 6:8,10 10:19 | 41:24 | **2007** |
| wasn't | **Y** | 10:20 | **10:04** | 16:10 |
| 14:19 25:5 | Yaacobovich | Zuk | 1:17 43:21 | **2009** |
| 25:23 27:25 | 6:2 | 6:22,25 7:1 | **100** | 11:3,7 23:18 |
| 38:22 | **Yahav** | 7:5,7,17 | 2:5 | 26:9 27:17 |
| way | 1:14 3:3 4:5 | 8:9,21 11:7 | **10001** | 35:3 |
| 16:19 25:16 | 4:8 5:2,16 | 13:1 14:4 | 1:21 2:12 | **2010** |
| 30:11 38:22 | 5:22,24,25 | 14:11,17,18 | **10023623** | 1:17 5:3 |
| Web | 6:3,20 11:7 | 14:19,23 | 1:3 | 44:12,14 |
| 4:16 10:13 | 13:8,10 | 15:18,25 | **12** | 45:15 |
| 35:5,10,18 | 31:12,14,17 | 16:3,6,9,15 | 1:3 | **2012** |
| weren't | 33:6,25 | 16:25 17:2 | **13** | 44:23 |
| 27:23 | 34:5,11 | 22:20,20 | 4:4,8 | **204** |
| wife | 35:16 42:3 | 24:24 25:3 | **15** | 1:21 2:13 |
| 31:10,15 | 44:11 45:8 | 25:3,4,7,11 | 19:15 35:24 | **23** |
| wife's | **Yahav's** | 25:13,15,15 | **17TH** | 1:17 5:3 |
| 33:22 | 4:5 13:11 | 32:2 34:18 | 1:1 | **23rd** |
| WITNESS | yeah | 34:23,25 | **19** | 44:12 |
| 3:2 5:15 | 7:10 8:23 | 35:12 37:21 | 44:23 | **28** |
| 26:2 35:22 | 16:17 19:25 | 38:3,12,25 | **19499** | 4:9,10 |
| words | 21:15,23 | 39:19 40:5 | 5:22 | **29** |
| 20:25 21:12 | 24:6 25:22 | 40:15 | | 23:18 |
| work | 27:2,8 | Zukerberg | **2** | **29th** |
| 17:10,12 | 29:20 31:18 | 7:1,2 | | 44:14 45:15 |
| 32:4 | 34:16 35:2 | Zuk's | **2** | |
| worked | 36:1 39:23 | 15:15 16:4 | 4:8 13:6,18 | **3** |
| 7:5,7,12,17 | 39:24 | Z-u-k-e-r... | 18:5 20:16 | |
| 15:22 | years | 7:3 | 20:18 21:1 | **3** |
| working | 7:6,7,9,11 | | 21:2 22:10 | 4:9 26:25 |
| 15:4 32:6,10 | 7:13,18 | **$** | 32:15 | 28:21,23 |
| 32:12 | 8:16,17 | $3,398,709 | **2.1** | 29:7,8,10 |
| works | 14:15,15 | 26:5 | 20:11 24:16 | 30:14 31:1 |
| 7:22 | 15:3,4,16 | $586,168 | 24:19 | **3.1** |
| | 17:4,6,7 | 24:21 | **2.5** | 30:24 31:1 |
| | | | 26:17 | |



Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Avi Yahav                                      July 23, 2010
                                                         55

| | |
|---|---|
| **3.2** | 39:8 |
| 27:1 | **5-minute** |
| **3.2(c)** | 41:21 |
| 27:19,20 | **50** |
| **30** | 31:22 |
| 26:8 27:17 | **50th** |
| 32:5 | 1:21 2:12 |
| **305.530.0050** | |
| 2:6 | **6** |
| **305.530.0055** | **6** |
| 2:7 | 4:14 32:16 |
| **33** | 32:21 34:9 |
| 4:12 | 34:12 |
| **33064** | |
| 6:6 | **7** |
| **33131-2114** | **7** |
| 2:6 | 4:16 18:6 |
| **33351** | 21:9 35:14 |
| 2:13 | 35:17 |
| **33498** | |
| 5:23 | **8** |
| **34** | **8:56** |
| 4:14 | 1:17 |
| **35** | |
| 4:16 42:25 | **9** |
| | **9:51** |
| **4** | 41:24 |
| **4** | **95** |
| 4:10 15:4 | 32:2 |
| 28:21,24 | **954.741.8228** |
| 29:7,10,11 | 2:14 |
| 30:14 | |
| **4000** | |
| 2:5 | |
| **44th** | |
| 6:5 7:18 | |
| 10:25 17:4 | |
| 22:13 23:11 | |
| 26:12 31:8 | |
| | |
| **5** | |
| **5** | |
| 3:4 4:12 | |
| 8:16,17 | |
| 14:15 15:3 | |
| 15:16 17:6 | |
| 17:7 33:4,7 | |



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

IN THE COUNTY COURT OF THE 17TH JUDICIAL CIRCUIT,
IN AND FOR BROWARD COUNTY, FLORIDA
CIVIL ACTION

CITIBANK, N.A., a national banking
association,

      Plaintiff,

  vs.

ANTICO STONE, LLC, a Florida limited
liability company, et. al.,

      Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.: CACE 10-023623

JUDGE: PETER M. WEINSTEIN

DIVISION: (12)

___

### DEFENDANTS, ANTICO STONE, LLC, YAHAV PROPERTIES, LLC and AVI YAHAV'S RESPONSE TO PLAINTIFF'S MOTION FOR ORDER TO SHOW CAUSE WHY PREJUDGMENT WRIT OF REPLEVIN SHOULD NOT BE ISSUED

    **COMES NOW**, the Defendants, ANTICO STONE, LLC, YAHAV PROPERTIES, LLC and AVI YAHAV, by and through the undersigned counsel, and file this Response to Plaintiff's Motion for Order to Show Cause Why Prejudgment Writ of Replevin Should not be Issued, and in support thereof states as follows:

1.     THAT on or about June 30, 2010 this court entered an order to show cause why prejudgement writ of replevin should not be issued against the Defendants, ANTICO STONE, LLC, YAHAV PROPERTIES, LLC and AVI YAHAV.

2.     THAT on or about June 30, 2009, the Defendant, ANTICO STONE, LLC entered into a Net Asset Purchase Agreement ("the Agreement") selling all of its assets to M.Z.A.Y. of Florida, Inc. (See Agreement attached hereto as exhibit "A").

3.     THAT as of on or about June 30, 2009, the Defendant, ANTICO STONE, LLC has no assets of its own to replevin.

4.     THAT as a result of the foregoing, the order to show cause why prejudgement writ of replevin should not be issued against the Defendants should be vacated.

    **WHEREFORE**, Defendants, ANTICO STONE, LLC, YAHAV PROPERTIES, LLC and AVI YAHAV move this Honorable Court to enter an order to set aside order to show cause why prejudgement writ of replevin should not be issued against the Defendants, for an award of attorney's fees and grant such other and further relief as this Honorable Court deems reasonable



EXHIBIT

Yahav 1
7-23-10

and just under the circumstances.

Respectfully submitted this $\underline{21^{st}}$ day of July, 2010.

LAW OFFICES OF DANIEL G. GASS, P.A.

By: _____

Daniel G. Gass, Esq.
Fla. Bar No.: 19569
10001 Northwest 50th Street, Suite 204
Sunrise, Florida 33351
Tel.: (954) 741-8228
Fax: (954) 746-7690

## CERTIFICATE OF SERVICE

The undersigned certifies a true copy of this document has been sent via facsimile and

U.S. Regular Mail to: Alan Rosenthal, Esq. with CARLTON FIELDS, P.A., at 100 S.E. 2nd

Street, Suite 4200, Miami, Florida 33131-2114 this $\underline{21^{st}}$ day of July, 2010.

LAW OFFICES OF DANIEL G. GASS, P.A.

By: _____

Daniel G. Gass, Esquire
Fla. Bar. No.: 19569
10001 Northwest 50th Street, Suite 204
Sunrise, Florida 33351
Tel.: (954) 741-8228
Fax: (954) 746-7690

# EXHIBIT "A"

Net Asset Purchase Agreement between Antico Stone, LLC, ("Seller") and M.Z.AY., Inc. ("Purchaser")

## NET ASSET PURCHASE AGREEMENT

This Net Asset Purchase Agreement ("Agreement") is entered in to this 30th day of June, 2009, by and between Antico Stone, LLC, ("Seller") and M.Z.A.Y. OF FL, INC. ("Purchaser").

### RECITALS

WHEREAS, Seller is the Owner of a certain business ("The Business") located at 2001 N.W. 44th Street, Pompano Beach, Florida 33064;

WHEREAS, Purchaser desires to purchase the Business including its tangible and intangible personal property referenced herein, as a going concern except any and all liabilities not specifically assumed herein, all upon the terms, provisions and conditions (and subject to the exclusions) set forth more specifically herein.

WHEREAS, Purchaser, M.Z.A.Y. OF FL, INC., is the assignee of a portion of the accounts payable due to Zuk Marble Products 1998, LTD in the amount of Five Hundred Eighty Six Thousand One Hundred Sixty Eight Dollars and NO/100 ($586,168.00) of the total of One Million Seventy Six Thousand Five Hundred Eighty Four Dollars and NO/100 ($1,076,584.00).

WHEREAS, Seller, Antico Stone, LLC, EIN: 65-1024668, has a controlling interest and is transferring and has been given the authority to transfer the net assets clear of all liabilities of the following sub-entities: Antico Stone NY, LLC, EIN: 20-2272545; Ciottoli, LLC. EIN: 56-2328221; and, Ciottoli Stoneworks NY, LLC, EIN: 20-2272701 and a Fifty Percent (50%) interest in Novo Collection East USA, Inc; EIN: 26-1817217.

NOW THEREFORE, for Ten and 00/100 Dollars ($10.00) and other good and valuable consideration, the receipt of which is hereby acknowledged by Seller, the parties agree as follows:

### ARTICLE I

1.1    **TERMS:** Subject to the terms, provisions and condition contained in this agreement, Seller shall sell to Purchaser and Purchaser shall purchase from Seller the following ("assets") more particularly described in Exhibit A:

(A)    All tangible personal property, attached hereto and incorporated herein, owned or utilized by Seller and now existing used in connection with the business now conducted thereon and the inventory as of June 30, 2009.

(B)    Buyer shall collect the receivable of Seller as of June 30, 2009 and remit same to Seller, less a twenty five percent (25%) collection allowance and administrative fee.

1

Net Asset Purchase Agreement between Antico Stone, LLC, ("Seller") and M.Z.AY., Inc. ("Purchaser")

(C) All intangible property now or hereafter owned or utilized by Seller in connection with the Business or otherwise comprising a portion of the assets, properties or business of the Business, including, but not limited to:

(1) all existing telephone numbers now used in connection with the operation of the Business and all advertisement of the Business paid for by Seller as of the closing date, except that Purchaser shall pay any fees arising in connection with the transfer of such telephone numbers to Purchaser.

(2) all good will associated with the Business.

(3) Any business name or D/B/A (Doing Business As) of Antico Stone, including but not limited to Antico, Antico Stone, and Ciottoli.

---

## ARTICLE II
## PURCHASE PRICE

2.1 **PRICE:** The purchase price for the assets shall be in the sum of Five Hundred Eighty Six Thousand One Hundred Sixty Eight Dollars and NO/100 ($ 586,168.00 U.S.) ("Purchase Price"). The purchase price shall be payable as follows:

| | |
|---|---|
| Debt Forgiven by Purchaser | $ 586,168.00 |

**ALLOCATION OF PURCHASE PRICE:** The purchase price for the assets shall be allocated as follows:

| | |
|---|---|
| Assets | $ 2,577,180 |
| Assumed Liabilities | $ 2,157,351 |
| Goodwill | $ 166,339 |

** Purchaser agrees to collect the Receivables of Seller outstanding as of June 30, 2009 and will retain twenty five percent (25%) of the amount collected and remit the balance to Seller at the end of each month.

The foregoing allocation will be reported to the Internal Revenue Service, pursuant to the Internal Revenue Code 1060, on Form 8594 Asset Acquisition Statement, by each of the parties hereto, by attachment to their Federal Income Tax Returns for the taxable year including the date of this Agreement.

2

Net Asset Purchase Agreement between Antico Stone, LLC, ("Seller") and M.Z.AY., Inc. ("Purchaser")

## ARTICLE III
## TITLE

**3.1**    **BILL OF SALE:** Title to the personal assets shall be conveyed to purchaser at closing by delivery to Purchaser by Seller of Seller's general bill of sale ("Bill of Sale"). The bill of sale shall convey title, free and clear of all security interests, liens, encumbrances or rights of others, by the payment of cash from the sale proceeds as of the closing date.

**3.2**    **SELLER'S WARRANTIES**  Seller herein warrants and guarantees the flowing:

(A)    That they are the owner's of all of the assets contemplated to be sold in this transaction.

(B)    That they have full authority from their Board of Directors to sell the above referred to assets to Purchaser.

(C)    That there are no liens, law suits pending or monies due on said assets.

(D)    That the Board of Directors has appointed the signer of this agreement to complete this sale on behalf of the company and to sign on behalf of the company any and all documents necessary to complete this transaction and transfer the assets listed in Schedule A attached.

(E)    That there are no violations of government orders (if any) and that the Seller is not in violation of any court order; that there are no known government investigations of Seller.

(F)    Further that Seller has no knowledge as to any reason these assets cannot legally be sold to Purchaser.

(G)    That Seller is in good standing as a Corporation in the State of Florida.

## ARTICLE IV
## COVENANTS PRIOR TO THE CLOSING

4.1    **SELLER'S DUTIES:**  Through the closing date, the Seller shall have the following duties:

(A)    Seller shall give to Purchaser, its principals and employees, reasonable access to all of the properties, books, contracts, documents, and records of Seller (including customer records relating directly or indirectly to the assets, such access being given during the Business's normal business hours. Seller will furnish to Purchaser such information with respect to the affairs of the Business as Purchaser may from time to time reasonably request. Access shall be upon reasonable advance notice to Seller, at times reasonably acceptable to Seller so as not to interfere with the business operations.

3

Net Asset Purchase Agreement between Antico Stone, LLC, ("Seller") and M.Z.AY., Inc. ("Purchaser")

(B)     Seller shall not intentionally perform any act or omit to perform any act that would (1) prevent or excuse the performance of this Agreement by the Purchaser, or (2) that would result in any representation or warranty herein contained of a party being untrue in any material respect if originally made as of the closing date.

(C)     Seller shall carry on the business of the Business in usual and customary manner in which it has been carried on.

(D)     Seller shall use its best efforts to retain the business organization of the Business intact, including keeping available the services of its present employees, representatives and vendors to the extent that Purchaser desires to retain such employees, representatives and vendors.

(E)     ~~Seller shall refrain from all acts intended to discourage any employees, representatives or vendors from becoming associated with purchaser.~~

(F)     Seller shall use its best efforts to obtain the consent of each contracting party who must consent to the assignment of any contract, lease or other instrument, assigned to purchaser hereunder.

(G)     Seller shall promptly give Purchaser written notice of the existence or occurrence of any condition that would make any representation or warranty made herein untrue, and that may prevent the consummation of the transactions contemplated herein or that would permit either party to terminate this transaction.

(H)     Seller shall not hereafter contract for any services nor make any commitments or obligations that will bind Purchaser as a successor in interest with respect to the business or assets other than:

(1)     service or maintenance contracts that Purchaser has approved or which are cancelable within thirty (30) days or less after giving notice thereof;

(2)     adding additional supplies and inventory as is necessary to operate the Business; and

(3)     day-to-day employment decisions necessary for the operation of the Business provided that such decisions are made in the exercise of Seller's reasonable discretion.

(I)     Seller shall maintain in full force and effect, general liability insurance on the property through the closing date and shall comply with any covenant requiring the purchase of general liability insurance after the closing date.

(J)     Seller shall conduct the Business as follows and shall:

4

Net Asset Purchase Agreement between Antico Stone, LLC, ("Seller") and M.Z.AY., Inc. ("Purchaser")

(1)     refrain from transferring any of the assets except to make normal replacements for wear and tear or otherwise in the ordinary course of business of the Business and refrain from creating any liens, mortgages, encumbrances, or other interests in the assets; and

(2)     continue to meet any contractual obligations.

4.2    PURCHASER'S DUTIES: Between the date hereof and the closing date:

(A)     Purchaser shall not intentionally perform any act or omit to perform any act that would prevent or excuse the performance of this Agreement by the Seller or would result in any misrepresentation or warranty herein contained of a party being untrue in any material respect if originally made as of the closing date.

(B)     Purchaser shall promptly give Seller written notice of the existence or occurrence of any condition that would make any representation or warranty herein contained untrue and that may prevent the consummation of the transactions contemplated herein or that would permit either party to terminate this transaction.

(C)     Notwithstanding anything to the contrary contained herein, purchaser agrees that Seller shall have the right to collect, for Seller's own account, all of Seller's Business accounts receivable and to retain any cash or other property received by Seller in respect to such receivables.

(D)     Purchaser shall treat as confidential, and will not submit, deliver or disclose the contents of this Agreement, or any negotiations that have been undertaken in connection therewith, or any of the contents of any properties, books, contracts, documents or records of Seller or information received from Seller pursuant to Section 6.1 (A), to any individual or entity, except purchaser's (a) shareholders; (b) employees; and (c) attorneys and accountants, all of whom shall also keep such information confidential.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE PARTIES

5.1    REPRESENTATION AND WARRANTIES OF SELLER: Seller hereby represents and warrants to purchaser that:

(A)     Seller has full power and authority to conduct business in the State of Florida and that all action necessary to authorize the execution and delivery of this Agreement and the consummation of the transaction contemplated herein by Seller has been taken;

5

Net Asset Purchase Agreement between Antico Stone, LLC, ("Seller") and M.Z.AY., Inc. ("Purchaser")

(B)    Neither the execution and delivery of this Agreement by Seller, nor the consummation of the contemplated transactions by Seller, will breach or conflict with any of the terms, conditions, or provision of any order, writ, injunction, or decree of any court, which order, writ, injunction or decree is directed to the Seller in particular, or of any agreement or other instrument to which the Seller is a party or by which Seller is bound including, without limitation, any lien, encumbrances, or any other security agreement;

(C)    To the best of Seller's knowledge, neither the execution and delivery or this Agreement by Seller nor the consummation of the contemplated transactions by Seller will conflict with, or result in a breach of any of the terms, conditions or provision of any law or regulation, or other order writ, injunction, or decree of any court;

(D)    Seller has not yet received any notice of, nor does it have any knowledge of any violation of any law or regulation affecting the Business or assets;

(E)    Seller has not received any notice, and does not have any knowledge of, or actual information regarding, any existing or threatened legal action of any kind with respect to which Seller is a party or to which the assets are subject;

(F)    Other than current thirty (30) day billings and those listed on Exhibit "B" attached hereto and made a part hereof, there are no unpaid liabilities, bills, or similar claims in connection with the Business or the operation, maintenance or repair of the personal property;

(G)    To the best of Seller's knowledge, there are no actions, suits, or proceedings pending or threatened against or relating to the practice or assets in any court or before any administrative agency;

(H)    Seller is not subject to any commitment, obligation or agreement which would bind Purchaser subsequent to consummation of this Agreement;

(I)    To the best of the Seller's knowledge, there have been prepared and filed the returns required to be filed as of their respective due date with the appropriate federal, state and local governmental agencies, all tax returns required to be filed by or on behalf of the Business, and such returns were correct and complete and that no taxes, penalties or assessments are due to be paid in connection with any such returns; that, as of the date hereof, to Seller's knowledge , the Seller is not a party to any pending action or proceeding, nor is any action or proceeding threatened by any governmental authority for the assessment or collection of income or any other taxes, and no claim for the assessment or collection of taxes has been asserted against the Business of Seller;

(J)    No representation or warranty made by Seller in this Agreement, nor any statement or certificate already furnished to Purchaser in connection with the transactions contemplated herein, contains any untrue statement or omits to state a material fact necessary to make the statements contained therein not misleading;

6

Net Asset Purchase Agreement between Antico Stone, LLC. ("Seller") and M.Z.AY., Inc. ("Purchaser")

(K)    This Agreement is a legal, valid, and binding obligation of Seller in accordance with its terms and conditions, subject to limitations, imposed by laws relating to the enforcement of creditors' rights upon bankruptcy, insolvency, reorganization and the like, and to usual equitable principles;

(L)    The customer lists and records of the Business to be conveyed by Seller pursuant to the provisions of Section 1.1.(B)(4) hereof, will contain adequate information on each customer who has obtained the services of the Business to the best of the seller's knowledge including (1) name; (2) most recently known address, and (3) most recently known telephone numbers (home and work, if applicable);

(M)    Seller has not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other compensation in connection with this agreement or the transaction contemplated hereby, and seller agrees to indemnify and hold harmless purchaser from and against and in respect of any such obligation or liability based in any way on agreements, arrangements or understandings claimed to have been made by purchaser with any third party.

(N)    Seller has not incurred any obligation or liability, contingent or otherwise, or other compensation in connection with this agreement or the transaction contemplated hereby, and seller shall indemnify and hold harmless purchaser from and against and in respect of any such obligation or liability based in any way on agreements, arrangements or understandings claimed to have been made by seller with a third party; and

Seller makes no representation or warranty as to the amount or nature of future business that may or may not arise from seller's existing customers. Purchaser acknowledges that no such representation or warranty has been made, and that this agreement is not contingent or conditioned upon or in any way related to the amount of future business, if any, to be derived from seller's existing customers.

5.2    REPRESENTATIONS AND WARRANTIES OF PURCHASER: Purchaser hereby represents and warrants to seller that:

(A) Purchaser is a corporation duly organized and in good standing under the laws of the State of Florida and has full corporate power to carry on its business in the State of Florida;

(B) Neither the execution and deliver of this agreement by the purchaser, nor the consummation of the contemplated transactions, will conflict with, or result in a breach of, any of the terms, conditions or provisions or any order, writ, injunction or decree of any court, which order, writ, injunction, or decree is directed to purchaser in particular or of the Articles of Incorporation or By-laws of the purchaser, or of any agreement or other instrument, to which the purchaser is a party or is bound;

7

Net Asset Purchase Agreement between Antico Stone, LLC, ("Seller") and M.Z.AY., Inc. ("Purchaser")

(C) To purchaser's actual knowledge, neither the execution and delivery of this agreement by the purchaser, nor the consummation of the contemplated transactions by the purchaser, will conflict with, or result in a breach of any terms, provisions or conditions of any law or regulation or other order, decree, writ or injunction of any court;

(D) No representation or warranty by the purchaser in this agreement, nor any document, statement, certificate or schedule furnished or to be furnished to the seller pursuant hereto or in connection with the transactions contemplated herein, contain any untrue statement of a fact or omits to state a material fact necessary to make the statement of fact contained therein not misleading;

(E) This agreement is a legal, valid and binding obligation of the purchaser, in accordance with its terms and conditions, subject to limitations, imposed by laws relating to the enforcement of creditors' rights upon bankruptcy, insolvency, reorganization and the like, and to usual equitable principals; and

(F) Purchaser has not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other compensation in connection with this agreement or the transaction contemplated hereby, and purchaser agrees to indemnify and hold harmless seller from and against and in respect of any such obligation or liability based in any way on agreements, arrangements or understandings claimed to have been made by purchaser with any third party.

### ARTICLE VI
### CLOSING

6.1    **DATE, TIME AND PLACE:**  The consummation of the transaction contemplated hereunder ("Closing") shall take place on or before June 30, 2009. The closing shall take place at: Law Offices of Daniel Gass, P.A., 10001 N.W. 50th Street, Suite 204, Sunrise, Florida 33351.

6.2    **SELLER'S DOCUMENTS:**  At the closing, Seller shall execute and deliver to Purchaser the following:

(A)    The bill of sale, in a form and in substance satisfactory to the Purchaser's counsel, in favor of Purchaser for all assets described in Article I, Section 1.1.

(B)    Without limitation by the specific enumeration of the foregoing, all other documents reasonably required to consummate the transactions herein contemplated.

6.3    **PURCHASER'S DOCUMENTS:**  At the closing, Purchaser shall execute or deliver to Seller the following:

(A)    A cash payment in accordance with the terms, provisions, and conditions of this Agreement.

8

Net Asset Purchase Agreement between Antico Stone, LLC, ("Seller") and M.Z.AY., Inc. ("Purchaser")

   (B) Any other documents reasonably requested by Seller required to consummate the transactions herein contemplated.

## ARTICLE VII
## CLOSING ADJUSTMENTS

  7.1 Any and all liabilities incurred in connection with any contracts, documents or instruments that are to be assigned to purchaser shall be prorated through May 27, 2009, or if otherwise, as of the closing date, but for the security deposit and last month's rent as to the Lease.

## ARTICLE VIII
## MISCELLANEOUS

  8.1 **NOTICE:** All notices to be given hereunder shall be in writing and shall be delivered in person or sent certified mail, return receipt requested, with postage prepaid, to the parties at the following addresses (or to such other or further addresses as the parties may hereafter designate by like notice similarly sent):

   If to Purchaser:    M.Z.A.Y. OF FL, INC.
             C/O Moshe Zuk
             2001 N.W. 44th Street,
             Pompano Beach, Florida 33064

        Copy to:   Marshall D. Platt, P.A.
             4030-C Sheridan Street
             Hollywood, Florida 33021

   If to Seller:     Antico Stone, LLC
             C/O Avi Yahav
             2001 N.W. 44th Street,
             Pompano Beach, Florida 33064

        Copy to:   Daniel Gass, P.A.
             10001 N.W. 50th Street; Suite 204
             Sunrise, Florida 33351

  All notices given in accordance with the foregoing shall be deemed given when delivered in person, or two days after being deposited in the United States Mail in accordance with the foregoing.

Net Asset Purchase Agreement between Antico Stone, LLC, ("Seller") and M.Z.AY., Inc. ("Purchaser")

8.2   **ENTIRE AGREEMENT:** This agreement and the exhibits attached hereto embody the entire agreement between the parties in connection with this transaction and there are no oral or parole agreements, representations or inducements existing between the parties relating to this transaction which are not expressly set forth herein and covered hereby. This agreement may not be modified except by a written agreement signed by the parties.

8.3   **SURVIVAL OF COVENANTS:** Each covenant set forth in Section 5.1 shall survive this closing and delivery of other documents contemplated herein for a period of twenty-four (24) months after the closing date, including all covenants and agreements which are to be performed or applied to circumstances subsequent to the closing date.

8.4   **BINDING EFFECT:** This agreement shall be binding upon and inure to the benefit of the parties hereto, their respective heirs, legal representatives, administrators, successors, successors in interest and assigns.

8.5   **HEADINGS:** The captions, section numbers and article numbers appearing in this agreement are inserted only as a matter of convenience and do not define, limit, construe, or describe the scope or intent of such paragraphs or articles of this agreement, nor in any way affect this agreement.

8.6   **GOVERNING LAW:** This agreement shall be construed and interpreted in accordance with the laws of the State of Florida.

8.7   **DRAFTING:**   This agreement shall be construed to be mutually drafted by both parties.

8.8   **DISCLOSURE OF INFORMATION:** Seller acknowledges that the books, records, lists of employees, lists of creditors and debtors, as well as list of "Antico Stone, LLC" customers as they may exist from time to time is a valuable, special and unique asset of Seller's business. Seller will not disclose said list to any other person, firm, corporation, association or other entity for any reason or purposes whatsoever. In the event of a breach, or threatened breach by Seller under the provisions of this paragraph, M.Z.A.Y. OF FL, INC. shall be entitled to an injunction restraining order and relief as to Seller from disclosing in whole or part any of the above referenced lists, or from rendering any services to any person, firm, corporation, association or other entity to whom said lists, in whole or part, have been disclosed or is threatened to be disclosed. Nothing herein shall be construed as prohibiting M.Z.A.Y. OF FL, INC. from pursuing any other remedy available to M.Z.A.Y. OF FL, INC. for such breach or threatened breach including the remedy of damages from Employee.

Any breach of these Agreements whatsoever shall cause the appropriate company to obtain without bond full restraining order and seek full redress and punitive damages as provided by Federal, State, and County Courts.

10

Net Asset Purchase Agreement between Antico Stone, LLC, ("Seller") and M.Z.AY., Inc. ("Purchaser")

8.10   **NON-COMPETITIVE AND RESTRICTIVE COVENANT:** Seller agrees that they are now in possession of certain valuable and confidential information and/or other benefits of Seller and herein agrees that said information shall be considered and treated as trade secrets and may not be disclosed outside the corporation by Seller. That the undersigned will not operate in any manner become interested in or establish, directly or indirectly, a business of similar nature, nor shall employee hire an employee, independent contractor or consultant of "Antico Stone, LLC" for any reason whatsoever as to conducting the same and/or similar business of "Antico Stone, LLC" for a period of five (5) year from the termination of this Agreement or the termination of any extension of this Agreement without the express written authority of M.Z.A.Y. OF FL, INC.. Any breach of this Agreement whatsoever shall cause the company to obtain without bond a full restraining order and seek full redress and punitive damages as provided by Federal, State and County Courts.

8.11   **ARBITRATION:** Both parties agree that all disputes arising in connection with this Agreement shall be submitted to and finally settled upon the rules of the American Arbitration Association ("AAA"), by a single arbitrator appointed in accordance with the then existing commercial rules of the AAA as the sole and exclusive remedy for any dispute arising hereunder. The length of the arbitration shall be agreed to by the parties and in no event shall exceed a total of seven (7) days in duration. The parties further agree that the arbitration shall take place in Fort Lauderdale, Broward County, Florida. The prevailing party in any such proceeding shall be reimbursed for its reasonable attorneys fees and costs incurred in the proceeding. The arbitrator shall designate who is the prevailing party. In the event that at the end of seven (7) days there is no prevailing party, then appropriate legal action may be taken by the filing of suit by either party.

8.12   **WAIVER OF BREACH:** The waiver by any party of a breach of any provision of this Agreement by the other party shall not operate or be construed as a waiver of any subsequent breach by either party. No waiver shall be valid unless in writing and signed by all parties.

**IN WITNESS WHEREOF,** the parties hereto have executed this agreement as of the day and year first above written.

PURCHASER: M.Z.A.Y. OF FL, INC.

By: _____
       Steve Levy, Treasurer

SELLER:  Antico Stone, LLC

By: _____
       Avi Yabav, Manager

11

Net Asset Purchase Agreement between Antico Stone, LLC, ("Seller") and M.Z.AY., Inc. ("Purchaser")

## EXHIBIT A - ASSET LIST

| | |
|---|---|
| 50% interest in Novo Collection East USA, Inc.EIN: 26-1817217 | $          -0- |
| Inventory | $ 3,398,709 |
| Allowance for obsolete & mark downs | $   926,148 |
| Tangible Assets | $   104,620 |
| Total Assets | $ 2,577,181 |

## EXHIBIT B - ASSUMED LIABILITY LIST

| | |
|---|---|
| Accounts Payable | $ 1,656,255 |
| Prepaid Accounts Receivable | $   351,097 |
| Loan from H.R. | $   150,000 |
| Total Liabilities | $ 2,157,352 |

12

## AFFIDAVIT OF AVI YAHAV

State of Florida:

County of Broward:

Before me, the undersigned authority, personally appeared AVI YAHAV, a witness of lawful age who, after being first duly sworn, deposes and states as follows:

1. My name is Avi Yahav, I am over 18 years of age and a resident of Palm Beach County, Florida.
2. I have personal knowledge of the validity of the facts set forth in this affidavit and understand the implications of giving testimony under oath.
3. I was the Manager of Antico Stone, LLC.
4. I have reviewed Defendants, Antico Stone, LLC, Yahav Properties, LLC and Avi Yahav's Response to Plaintiff's Motion for order to Show Cause Why Prejudgment Writ of Replevin Should Not Be Issued and agree with the contents therein.
5. I further state the attached Net Asset Purchase Agreement was signed by me as Manager of Antico Stone, LLC and by an officer of the purchasing entity.
6. The inventory that is the subject of this Replevin action is no longer owned or possessed by Antico Stone, LLC, via the above referenced Net Asset Purchase Agreement.
7. Nor is the inventory that is the subject of the Replevin action owned or possessed by the purchasing entity. Since the inventory was liquidated to pay Antico Stone, LLC and its regular operating expenses and has since been turned over and replaced.

FURTHER AFFIANT SAYETH NAUGHT.

_____
AVI YAHAV

Sworn to and subscribed before me, the undersigned authority, by AVI YAHAV, who did take an oath on this 22nd day of July, 2010. AVI YAHAV produced the following ID:_____

_____
Notary Public – State of Florida

DORCIANE POLITO
MY COMMISSION # DD 918696
EXPIRES: October 7, 2013
Bonded Thru Notary Public Underwriters

EXHIBIT
Yahav 2
7-23-10

# COMMERCIAL SECURITY AGREEMENT

| Grantor: | Antico Stone, LLC<br>2001 NW 44th Street<br>Pompano Beach, FL 33064 | Lender: | Citibank, N.A.<br>210 West Lexington Drive<br>Glendale, CA 91203 |
|---|---|---|---|

THIS COMMERCIAL SECURITY AGREEMENT dated ___Oct 16-3 ro6___ , is made and executed between Antico Stone, LLC ("Grantor") and Citibank, N.A. ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

All personal property of every kind and nature, including, without limitation, all accounts (including healthcare insurance receivables), goods (including inventory, equipment, fixtures and any accessions thereto and embedded software), chattel paper (whether electronic, tangible or intangible), documents, instruments (including promissory notes), general intangibles, letter of credit rights (whether or not the letter of credit is evidenced by a writing), supporting obligations, commercial tort claims, investment property (including securities), money, deposit accounts, and other contract rights or rights to the payment of money

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender and its subsidiaries and affiliates (whether checking, savings, or some other account and whether evidenced by a certificate of deposit). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

Perfection of Security Interest. Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender.

Notices to Lender. Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management or in the members or managers of the limited liability company Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

No Violation. The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its membership agreement does not prohibit any term or condition of this Agreement.

Removal of the Collateral. Except in the ordinary course of Grantor's business, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.







Transactions Involving Collateral. Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender.

Title. Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

Repairs and Maintenance. Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

Inspection of Collateral. Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

Taxes, Assessments and Liens. Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, reasonable attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

Compliance with Governmental Requirements. Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including without limitation payment when due of all taxes, assessments and liens upon the Collateral.

Maintenance of Casualty Insurance. Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require.

Financing Statements. Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement. If Grantor changes Grantor's name or address, or the name or address of any person granting a security interest under this Agreement changes, Grantor will promptly notify the Lender of such change.

LENDER'S EXPENDITURES. If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

DEFAULT. Each of the following shall constitute an Event of Default under this Agreement:

Payment Default. Grantor fails to make any payment when due under the Indebtedness.

Other Default. Grantor fails to comply with any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents.

Default in Favor of Third Parties. Should Borrower default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Grantor's property or Grantor's ability to repay the Indebtedness or perform Grantor's obligations under this Agreement or any related document.

False Statements. Any representation or statement made by Grantor to Lender is false in any material respect.

Insolvency. The dissolution of Grantor (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Grantor's existence as a going business or the death of any member, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

Creditor or Forfeiture Proceedings. Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness.

Events Affecting Guarantor. Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or

becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of any Event of Default under any Indebtedness, or should Grantor fail to comply with any of Grantor's obligations under this Agreement, Lender shall have all the rights of a secured party under the New York Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment fee which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral (including legal fees and costs), shall become a part of the Indebtedness secured by this Agreement and payable from the proceeds of the disposition of the Collateral, and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**WAIVE JURY. ALL PARTIES TO THIS AGREEMENT HEREBY WAIVE THE RIGHT TO ANY JURY TRIAL IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY, TO THE EXTENT PERMITTED BY APPLICABLE LAW.**

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Governing Law.** With respect to procedural matters related to the perfection and enforcement of Lender's rights against the Collateral, this Agreement will be governed by federal law applicable to Lender and to the extent not preempted by federal law, the laws of the State of New York. In all other respects, this Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Florida without regard to its conflicts of law provisions. However, if there ever is a question about whether any provision of this Agreement is valid or enforceable, the provision that is questioned will be governed by whichever state or federal law would find the provision to be valid and enforceable. The loan transaction that is evidenced by the Note and this Agreement has been applied for, considered, approved and made, and all necessary loan documents have been accepted by Lender in the State of Florida.

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Dade County, State of

Florida. Nothing herein shall affect the right of the Lender to bring any action or proceeding against the Grantor or its property in the courts of any other jurisdiction.

No Waiver by Lender. Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

DEFINITIONS. The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

Agreement. The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

Borrower. The word "Borrower" means Antico Stone, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

Collateral. The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

Event of Default. The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

Grantor. The word "Grantor" means Antico Stone, LLC.

Guarantor. The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

Guaranty. The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

Indebtedness. The word "Indebtedness" means all present and future loans, advances, overdrafts, liabilities, obligations, guaranties, covenants, duties and other debts at any time owing by Grantor to Lender, whether evidenced by this Agreement, a promissory note or other instrument, any Related Documents, or any other document or agreement, whether arising from an extension of credit, opening of a letter of credit, banker's acceptance, loan, overdraft, guaranty, indemnification or otherwise, whether direct or indirect (including, without limitation, those acquired by assignment and any participation by Lender in Grantor's debts owing to others) absolute or contingent, due or to become due, including, without limitation, all interest, charges, expenses, fees, attorneys' fees (including attorneys' fees and expenses incurred in bankruptcy), expert witness fees and expenses, fees and expenses of consultants, audit fees, letter of credit fees, closing fees, facility fees, termination fees, and any other sums chargeable to Grantor under this Agreement, the Note, any Related Documents, or under any other present or future instrument, document or agreement between Grantor and Lender.

Lender. The word "Lender" means Citibank, N.A., its successors and assigns.

Note. The word "Note" means and includes without limitation Borrower's promissory note or notes, if any, or any credit agreement or loan agreement, evidencing Borrower's Indebtedness, as well as any substitute, replacement or refinancing note or notes or credit agreement or loan agreement therefore.

Property. The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

Related Documents. The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED _____.

GRANTOR:

ANTICO STONE, LLC

By: _____
     Avi Yahav, formerly known as Avi Yaacobovich,
     Managing Member of Antico Stone, LLC

# COMMERCIAL SECURITY AGREEMENT

| Grantor: | Ciottolo, L.L.C<br>2001 NW 44th Street<br>Pompano Beach, FL 33064 | Lender: | Citibank, N.A.<br>210 West Lexington Drive<br>Glendale, CA 91203 |
|----------|----------------------------------------------------------------------|---------|-------------------------------------------------------------------|

THIS COMMERCIAL SECURITY AGREEMENT dated Oct 16, 2016, is made and executed between Ciottolo, L.L.C ("Grantor") and Citibank, N.A. ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

All personal property of every kind and nature, including, without limitation, all accounts (including healthcare insurance receivables), goods (including inventory, equipment, fixtures and any accessions thereto and embedded software), chattel paper (whether electronic, tangible or intangible), documents, instruments (including promissory notes), general intangibles, letter of credit rights (whether or not the letter of credit is evidenced by a writing), supporting obligations, commercial tort claims, investment property (including securities), money, deposit accounts, and other contract rights or rights to the payment of money

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender and its subsidiaries and affiliates (whether checking, savings, or some other account and whether evidenced by a certificate of deposit). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

Perfection of Security Interest. Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender.

Notices to Lender. Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management or in the members or managers of the limited liability company Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

No Violation. The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party; and its membership agreement does not prohibit any term or condition of this Agreement.

Removal of the Collateral. Except in the ordinary course of Grantor's business, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.



EXHIBIT

4

7-23-0

EXHIBIT

O

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, reasonable attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including without limitation payment when due of all taxes, assessments and liens upon the Collateral.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement. If Grantor changes Grantor's name or address, or the name or address of any person granting a security interest under this Agreement changes, Grantor will promptly notify the Lender of such change.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Default.** Grantor fails to comply with any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents.

**Default in Favor of Third Parties.** Should Borrower default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Grantor's property or Grantor's ability to repay the Indebtedness or perform Grantor's obligations under this Agreement or any related document.

**False Statements.** Any representation or statement made by Grantor to Lender is false in any material respect.

**Insolvency.** The dissolution of Grantor (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Grantor's existence as a going business or the death of any member, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or

becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

Adverse Change.  A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

Insecurity.  Lender in good faith believes itself insecure.

RIGHTS AND REMEDIES ON DEFAULT.  Upon the occurrence of any Event of Default under any Indebtedness, or should Grantor fail to comply with any of Grantor's obligations under this Agreement, Lender shall have all the rights of a secured party under the New York Uniform Commercial Code.  In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

Accelerate Indebtedness.  Lender may declare the entire Indebtedness, including any prepayment fee which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

Assemble Collateral.  Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral.  Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender.  Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral.  If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

Sell the Collateral.  Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor.  Lender may sell the Collateral at public auction or private sale.  Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made.  However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale.  The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition.  All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral (including legal fees and costs), shall become a part of the Indebtedness secured by this Agreement and payable from the proceeds of the disposition of the Collateral, and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

Collect Revenues, Apply Accounts.  Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral.  Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine.  Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due.  For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral.  To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

Obtain Deficiency.  If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement.  Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

Other Rights and Remedies.  Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time.  In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

Election of Remedies.  Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently.  Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

WAIVE JURY.  ALL PARTIES TO THIS AGREEMENT HEREBY WAIVE THE RIGHT TO ANY JURY TRIAL IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY, TO THE EXTENT PERMITTED BY APPLICABLE LAW.

MISCELLANEOUS PROVISIONS.  The following miscellaneous provisions are a part of this Agreement:

Amendments.  This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement.  No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

Attorneys' Fees; Expenses.  Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement.  Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement.  Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services.  Grantor also shall pay all court costs and such additional fees as may be directed by the court.

Governing Law.  With respect to procedural matters related to the perfection and enforcement of Lender's rights against the Collateral, this Agreement will be governed by federal law applicable to Lender and to the extent not preempted by federal law, the laws of the State of New York.  In all other respects, this Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Florida without regard to its conflicts of law provisions.  However, if there ever is a question about whether any provision of this Agreement is valid or enforceable, the provision that is questioned will be governed by whichever state or federal law would find the provision to be valid and enforceable.  The loan transaction that is evidenced by the Note and this Agreement has been applied for, considered, approved and made, and all necessary loan documents have been accepted by Lender in the State of Florida.

Choice of Venue.  If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Dade County, State of

Florida. Nothing herein shall affect the right of the Lender to bring any action or proceeding against the Grantor or its property in the courts of any other jurisdiction.

No Waiver by Lender. Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

DEFINITIONS. The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

Agreement. The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

Borrower. The word "Borrower" means Ciottolo, L.L.C. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

Collateral. The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

Event of Default. The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

Grantor. The word "Grantor" means Ciottolo, L.L.C.

Guarantor. The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

Guaranty. The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

Indebtedness. The word "Indebtedness" means all present and future loans, advances, overdrafts, liabilities, obligations, guaranties, covenants, duties and other debts at any time owing by Grantor to Lender, whether evidenced by this Agreement, a promissory note or other instrument, any Related Documents, or any other document or agreement, whether arising from an extension of credit, opening of a letter of credit, banker's acceptance, loan, overdraft, guaranty, indemnification or otherwise, whether direct or indirect (including, without limitation, those acquired by assignment and any participation by Lender in Grantor's debts owing to others), absolute or contingent, due or to become due, including, without limitation, all interest, charges, expenses, fees, attorneys' fees (including attorneys' fees and expenses incurred in bankruptcy), expert witness fees and expenses, fees and expenses of consultants, audit fees, letter of credit fees, closing fees, facility fees, termination fees, and any other sums chargeable to Grantor under this Agreement, the Note, any Related Documents, or under any other present or future instrument, document or agreement between Grantor and Lender.

Lender. The word "Lender" means Citibank, N.A., its successors and assigns.

Note. The word "Note" means and includes without limitation Borrower's promissory note or notes, if any, or any credit agreement or loan agreement, evidencing Borrower's Indebtedness, as well as any substitute, replacement or refinancing note or notes or credit agreement or loan agreement therefore.

Property. The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

Related Documents. The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED _Octobr 16, 202_

GRANTOR:

CIOTTOLO, L.L.C

By: _____
     Avi Yahav, Manager of Ciottolo, L.L.C

www.sunbiz.org - Department of State



FLORIDA DEPARTMENT OF STATE
DIVISION OF CORPORATIONS

| Home | Contact Us | E-Filing Services | Document Searches | Forms | H |

Previous on List    Next on List    Return To List    Entity Nam

No Events    No Name History    Sut

# Detail by Entity Name

## Florida Profit Corporation

ANTICO STONE & TILE COLLECTION, INC.

## Filing Information

Document Number P09000041103
FEI/EIN Number NONE
Date Filed 05/08/2009
State FL
Status ACTIVE
Effective Date 05/07/2009

## Principal Address

2001 N.W. 44TH STREET
POMPANO BEACH FL 33064

## Mailing Address

2001 N.W. 44TH STREET
POMPANO BEACH FL 33064

## Registered Agent Name & Address

YAHAV, AVI
2001 N.W. 44TH STREET
POMPANO BEACH FL 33064 US

## Officer/Director Detail

Name & Address

Title P

ZUK, MOSHE
C/O 2001 N.W. 44TH STREET
POMPANO BEACH FL 33064

Title VP

YAHAV, AVI
2001 N.W. 44TH STREET
POMPANO BEACH FL 33064

Title S, T



EXHIBIT
Yahav 6
7-23-10

www.sunbiz.org - Department of State

GOMEZ, NELSON
2001 N.W. 44TH STREET
POMPANO BEACH FL 33064

## Annual Reports

**No Annual Reports Filed**

## Document Images

05/08/2009 -- Domestic Profit    View image in PDF format

**Note:** This is not official record. See documents if question or conflict.

Previous on List        Next on List        Return To List                                    Entity Nam

**No Events**        **No Name History**                                                      : Sub

Home | Contact Us | Document Searches | E-Filing Services | Forms |

Copyright and Privacy Policies
State of Florida, Department of State

WELCOME TO ANTICO STONE



HOME          COMPANY          PRODUCTS          PROJECTS          NEWSLETTER          CONTACT

COMPANY >> ABOUT US

Welcome to Antico Stone & Tile! Since the beginning we have strived to become your best source for natural stone products from around the world. We continue to introduce the latest materials in various colors, sizes, and finishes to fit the discriminating tastes of our customers. Our old world patterns with unique finishes and color blends are true works of art. We invite you to visit our show rooms across Florida and New Jersey to see all the new and exciting products.

Take advantage of our world wide buying power on your next project to get the best pricing and service in the industry. We take pride in being able to provide special materials to make your design as flawless and beautiful as you imagined. Our knowledgeable sales people are also available to service you and bring the latest samples or any of our marketing programs so you can take advantage of our large inventory and national distribution network.

Antico Stone & Tile understands that Natural Stone is an investment and that our customers trust us to give them the best material and the best service available. We take this trust seriously so our customers will rely on us to be their partners for all their natural stone needs.

Antico Stone & Tile has supplied renowned projects like:

Kabbatah Center-Boca Raton, FL          St. Regis Hotel & Residence – Ft. Lauderdale, FL

Mayfair Hotel – Coconut Grove, FL          Four Seasons Palm Beach, Palm Beach, FL

Hotel De-Sole- Miami Beach, Fl          Cheeca Lodge, Islamorada, FL

The Addison- South Beach, FL          Heart Regency, Trinidad & Tobago

Bethamare – Williams Island, FL          Hotel in Chicago, IL

Dalles International Airport – Dulles, VA          Ritz Carlton, Manalapan, FL

5th on the Park- New York City, NY          Modern art Building, New


EXHIBIT
Slater 7
7-23-10 X8

WELCOME TO ANTICO STONE

York City , NY

and many more from our distribution facilities in Pompano Beach, FL and Carlstadt, NJ



| HOME | COMPANY | PROJECTS | | |

COMPANY >> DYNAMIC HOME ALLIANCE

Dynamic Home Alliance was established by Doug Johnson of Felix & More than & Tile, Eli Mordechai of La Strada Furniture & Interiors and Meni Dvir Construction Industry here in South Florida.

Having been heavily involved in the industry, they actually have met the need for their clients to benefit from services that other contractors, but will also give their their business



The companies involved in DHA can cater to all your home needs. Construction Association of South Florida and have built and maintained DHA has the right connections with builders, interior designers and architects within your budget, cater to your requests, time frame, and scope of work.

To obtain a free estimate, DHA will pick up your plans or you can email them effortless on your end and is equipped to give you the best possible custom working with you and making your project that much simpler.

One call solves it all!



AMG Stone



We are a custom granite, marble and natural stone fabrication/installation company. We pride ourselves on our expert craftsmanship, attention to detail, and customer satisfaction. Our mission is to give every job the very best possible craftsmanship for the fairest cost. We serve all of South Florida residential and commercial interests. Whether it is a bath, fireplace surround outdoor barbeque, kitchen, or custom piece, one can rely on AMG Stone for fine craftsmanship in natural stone. We are a highly skilled team of stone fabricators and pride ourselves in delivering an excellent product, superior workmanship and design. Customer Service, reliability, timely production and delivery are most important to us.







### Antico Stone & Tile

Antico Stone & Tile has been the industry leader in all fields of natural Stone since its U.S. opening in the year 2000. locations in Pompano Beach, Davie, Naples, Stuart, FL and Carlstadt, NJ. We set and consist with us as the in the nations leading direct importer and distributor of high-end decorative stone, natural stone, porcelain, stone & glass mosaics, tumbled stones and slabs. Our Materials are stocked in large quantities in sizes ranging from 1/2"x1/2" to 36"x36" and slabs, with finishes such as Honed, Filled, Polished, Brushed, and Tumbled. We offer a product for every project and have the ability to supply unique projects requiring special unconventional sizes or finishes with high quality materials manufactured at our overseas factory.



### Home System Design

Let our years of combined experience and knowledge help you to interest the latest high-end home technologies into your home. We custom design, install and sell electronic systems for homes and businesses creating a lifestyle totally unique for each client. Our passion for quality have provided South Florida's homeowners, architects, designers and builders with innovative solutions comprehensive technical experience and knowledge needed to design and build an automated house using the latest technology and equipment available. Home System Design will design your home so you can efficiently manage lighting, thermostat, audio/video distribution, security, window treatment and much more.





INTERI  DECOR

### Inter Decor

Inter Decor's refined signature is a blend of innovation, elegance and prestige transcending ordinary into ingenious manifestations. Inter Decor is a one-stop-shop for all your needs of decorative finishes, architectural mouldings, lighting design, faux finish, mural arts, Venetian plaster, custom and faux paint, stencil arts, guilding and wood graining arts for commercial and residential properties.

Daniel Rosenberg and his team of skilled experts offer unparalleled products and services to the design and trade professionals as well as directly to their clientele.







### La Strada

Since 1970 LaStrada's motto has been: "if you can dream it we can build it" now is the time to PUT US TO THE CHALLENGE!

LaStrada's custom-made designs provide the freedom to create the home you've always envisioned, but never thought you'd find. Let us show you how every room can benefit from LaStrada's design expertise and innovative concepts. Our imagination knows no bounds! At our own factory, master craftsman combine "Old World" skills with the most advanced technology bringing to life your furniture fantasies - from the simple elegance of beautifully carved chairs, to units with a James Bond -style mechanisms.



### Light My Landscape

Light My Landscape specializes in creating visual artistry through low voltage outdoor lighting. Our Landscape and Architectural lighting designs (low volt & line volt) are unsurpassed in product quality and design excellence.



Landscape and Architectural lighting is an Art form. It requires the ability to understand the main principles of lighting levels, elements, form, balance, transitions, and texture. Blending all of these principles together to make a cohesive nighttime lighting portrait is what sets Bunny Frank, Certified Lighting Designer and Visual Artist and her team @ Light My Landscape apart from all others. Bunny and Light My Landscape will not allow the structural features nor landscape to be swallowed up by the darkness of night.





### Tubs & More

Tubs & More has been in business for over 20 years selling most major builders in Florida and around the US. We have an impressive 8,000 sq. ft. showroom in Sunrise, Florida, where we have been supplying and servicing not only the general public, but leading homebuilders, plumbers, architects, and members of the design industry. We have a talented sales and customer service team that exceeds consumers' expectations and maintains strong working relationships throughout the years. When planning a project, you want to hire a team that is knowledgeable and will want to satisfy all your needs, regardless of how much time or energy is involved. Our goal is to capture your personal vision and transform it to a beautiful reality.



WELCOME TO ANTICO STONE



### Service Master Clean

ServiceMaster Clean by Robinson has continued to grow through the years through a continuing philosophy of honesty and integrity in business. From the beginning, our goals have always been to provide the very best customer experience through attention to detail and fair pricing practices. These same practices apply today, and our staff is always available to answer any questions you may have, whether it be about our emergency response unit in a disaster situation, or bringing freshness back into your home with our cleaning division. ServiceMaster Clean by Robinson has a highly qualified staff with leading credentials in the industry so you can be assured when our crew members are on your property, your in expert hands!



### Stone Profiles

Stone Profiles is a leading international manufacturer and installer of architectural pre-cast concrete products. With expertise in wet cast, dry tamp and GFRC product lines, Stone Profiles is able to fulfill the requirements of any architectural pre-cast project. Our ability to distribute product both nationally and internationally (including projects in the Caribbean) together with our capacity to bond projects allows us to enjoy an impressive list of quality, repeat clients. Traditionally, architectural pre-cast products have been limited to exterior building elements. Today, Stone Profiles provides a complete line of concrete products for hearth and home including beautiful kitchen and bath fixtures.

complete catalog available by request

WELCOME TO ANTICO STONE





### Van Kirk Pools & Spas

Ranked in 2007 and 2008 as one of the Nation's Top 50 most successful pool companies, by Hanley Wood's Pool Spa News, Van Kirk Sons is a full-service commercial and residential pool builder specializing in new construction and remodeling. Established since 1975, the company has earned its reputation based on their passion, integrity, hard work and professionalism. These values have given Van Kirk's clients the confidence that will exceed their expectations on each and every project. Recent commercial projects include Fontainebleau Hotel, Miami Beach; Ritz-Carlton, Palm Beach; The Peninsula Hotel; multiple 24 Hour and LA Fitness's; The Ft. Lauderdale Grande Hotel and Club; The Fort Lauderdale Yankee Trader and so much more.



Copyright 2009-2010. All Rights Reserved.



| HOME | COMPANY | PRODUCTS | PROJECTS | NEWS INFO |

COMPANY >> PARTNERS & ASSOCIATES

**ZUK MARBLE**



**NEGEV CERAMICS**

**LA STRADA**





**AJAMI FLOORING & GRANITE**



**TREND USA**



**THE MARKET & DESIGN**





**CUSTOM GLASS FABRICATORS, LLC**



Copyright 2009-2010. All Rights Reserved



| HOME | COMPANY | PRODUCTS | PROJECTS | NEWS LETTER | CONTACT US |
|------|---------|----------|----------|-------------|------------|

NEWS LETTER

## ANTICO STONE & TILE
6702 Benjamin Road #700
Tampa, FL 33634



**COME CHECK OUT OUR NEW
DESIGNER FRIENDLY
SHOWROOM**

**NEW EXOTIC MATERIALS**

**LARGEST IMPORTERS OF
STONE**

**OVER 100 MOSAICS TO CHOOSE
FROM**

**INNOVATIVE SIZES &
FINISHES**

**STONE/TILE/GLASS MOSAICS**

FACTORS TO CONSIDER WHEN
SELECTING
NATURAL STONE.....FINISHES
such as:

**Tumbled:** A tumbled finish is achieved
by placing limestone, travertine, slate,
or marble in a special "tumbling

drum", along with aggregate, chemicals, or pebbles. These aggregates labor to create a wonderfully warn weathered effect by battering the surface of the tile as well as rounding and softening its edges.

Brushed: A coarse-wire rotary brush is passed over the face of a stone resulting in a texture that reflects a worn, satin-smooth finish.

Undulated/Wavy: An undulated finish re-creates the look of tile that has survived extreme elemental exposure and endured a thousand years of foot traffic.

Bush Hammered: A process by which a tile is battered by machine, leaving behind a rough dimpled surface.

Reclaimed: Original stone flooring that has been carefully removed from the existing homes, streets, and shops of Old World countries.

Acid Washed: The process of treating stone surface with acidic substances to give the tile an aged texture and appearance.

Polished: Polished granite surface is created by using abrasives and then polishing substances. This is a typical finish that is given to granite slabs which are to be used for fabrication of kitchen countertops and other granite fabrications for interior decoration. Polishing gives granite brightness and a mirror-like effect that intensifies granite colors and enhances the pattern. Polishing also reduces the porosity of the granite which increases

granite's resistance to humidity and chemical substances commonly found in the kitchens. This is why polishing is the preferred surface treatment for kitchen countertops.

Honing: Honed surface is achieved by the use of abrasives as well, but unlike polished granite honed granite has a smooth, non-reflective surface. Honed granite is more porous than polished granite and therefore it is not recommended for use on kitchen countertops in heavily use kitchens. Honed granite may be used in areas with less exposure to chemicals such as vanity tops or table tops.

Chiseled Edge: A chiseled edge is normally found on aged marble, travertine, and limestone. By the use of a chain braker or special drill bit, the edge of the tile is given a highly distressed appearance, while the surface remains honed and smooth.

Pillowed: This type of finish features a rounded tile edge, which gives it a cushioned or pillowed appearance. The effect can be subtle, reflecting a modest radius curve, or dramatic, featuring a deep radius depression.

Flaming: Flaming consists of passing a nozzle emitting high-temperatures and a high-speed flame over the granite surface. The surface of the flamed granite becomes rugged and irregular with no sharp edges. The colors of the flamed granite are usually less intense, more toned down than the colors of polished granite. In veined granites with a lot of movement and pattern, flaming reduces the perception of veining as opposed to polishing, which intensifies the movement in veined granite.

WELCOME TO ANTICO STONE

Copyright 2009-2010. All Rights Reserved.



| HOME | COMPANY | PRODUCTS | PROJECTS | NEWSLETTER | CONTACTS |

CONTACT US

## LOCATIONS:

**Antico Stone & Tile**
2001 NW 44th Street
Pompano Beach, FL 33064
Toll Free: 866-826-8426
P: 954-978-7925
F: 954-978-8858
terrah@anticostone.com



**Antico Stone & Tile**
125 Asia Place
Carlstadt, NJ 07072
P: 201-487-4101
F: 201-487-4104



**Antico Stone & Tile**
6702 Benjamin Road #700
Tampa, FL 33634
P: 813-886-8915
F: 813-882-4835



**Antico Stone & Tile**
4392 Corporate Square Blvd
Naples, FL 34104

WELCOME TO ANTICO STONE

P: 954-978-7925
F: 954-978-8858
To see Ryan please make Appointment
Cell:561-756-6028



Antico Stone & Tile /Tile Market & Design
1001 Jupiter Park Drive #123
Jupiter, FL 33458
P: 561-747-6216
F: 561-747-6219

Antico Stone & Tile/Ajami Flooring &
Granite
7860 NW 58th Street
Miami, FL 33166
P: 305-592-7272
F: 305-599-0356
To see Carlos please make Appointment
Cell:954-736-9328



Copyright 2009-2010, All Rights Reserved.